**NORTHERN STATES POWER COMPANY, a Minnesota corporation, Plaintiff,**

v.

**INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, a Delaware corporation, Defendant.**

**Civ. No. 4–80–280.**

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 27, 1982.

John L. Devney, Michael H. Streater, Briggs & Morgan, St. Paul, Minn., for plaintiff.

Jack M. Fribley, Faegre & Benson, Minneapolis, Minn., for defendant.

MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Plaintiff Northern States Power Co. (NSP) brings this action for damages against defendant International Telephone and Telegraph Corp. (ITT) alleging breach of warranties, contract breach, misrepresentation, strict liability in tort,[1] negligence, and fraudulent inducement to contract. Diversity jurisdiction is alleged under 28 U.S.C. § 1332. The matter comes before the court on ITT's motion to dismiss NSP's tort claims (Counts III, IV, V, and VI of the Amended Complaint) for failure to state a claim upon which relief can be granted and for partial summary judgment dismissing NSP's claims for consequential damages.

*Factual Background*

NSP contracted with Meyer Industries of Red Wing, Minnesota (Meyer), a division of ITT.[2] Meyer was to manufacture, and NSP to buy, certain 16,000 ft. lb. screw anchors and extensions for use in the installation and erection of power line towers by contract was negotiated in Minnesota. It was largely executed in Minnesota, but the screw anchors were assembled in Wisconsin.

The screw anchors were to be emplaced in the ground and attached by guy wires to a point near the top of a power line tower. Four anchors were to be placed around each tower to hold the tower firmly in place. Each screw anchor consisted of 10′ long lead sections capable of being augured into the ground. Extensions either 5′ or 10′ long could be added so that the extended anchor was emplaced deeply enough into the ground to adequately anchor the towers. Numerous extensions could be added if necessary. Each anchor extension had a coupling welded to one end to attach to a connecting section of anchor by bolting them together.

On June 9, 1978, NSP sent a "Request for Quotation" to Meyer and others for the

---

1. The amended complaint includes a claim of strict liability in tort. Although the actual amendment occurred after the hearing on defendant's motion, the parties apparently agree that the motion incorporates the strict liability count.

2. Subsequently, Meyer Industries became a division of ITT Grinnell Corporation.

manufacture of the screw anchors. Meyer responded with a proposal (Roberts Affidavit, Ex. A) on July 6, 1978, which included an attachment entitled "Provisions of Proposal." This provided in part:

2) Reference RFQ Form[3], Additional Instructions, Section 1, Paragraph 6. "In accepting an order, Seller/Contractor agrees ...". Delete this paragraph and replace with Item 16, Meyer Industries Warranty and Limitation of Liability Clause.

An attached document, entitled "Terms and Conditions of Sale. Meyer Industries.", contained "Item 16" which states in part:

(16) WARRANTY AND LIMITATION OF LIABILITY

Meyer Warrants for one (1) year that all Products (a) are designed in accordance with generally accepted engineering practice, (b) will withstand destruction test loads to the extent of the calculated loads of yield stress the Products are designed to withstand, (c) will be fabricated in accordance with drawings furnished by Meyer and approved by Buyer, and (d) are free from defects in materials and workmanship."

Meyer's liability for any breach of this warranty shall be limited solely to job site replacement or repair, at the sole option of Meyer, of any defective part or parts, during a period of one (1) year from the date of shipment, providing the Product is properly installed and is being used as originally intended.

IT IS EXPRESSLY AGREED THAT THIS SHALL BE THE SOLE AND EXCLUSIVE REMEDY OF THE BUYER. UNDER NO CIRCUMSTANCES SHALL MEYER BE LIABLE FOR ANY COSTS, LOSS, EXPENSE, DAMAGES, SPECIAL DAMAGES, INCIDENTAL DAMAGES OR CONSEQUENTIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE USE OF THE PRODUCTS. WHETHER BASED UPON WARRANTY, CONTRACT, NEGLIGENCE OR STRICT LIABILITY.

After contract discussions in July and August of 1978 (during which no discussion of the limitation of liability took place), NSP issued a "Purchase Order" on August 17, 1978 which made no specific mention of the liability limitations of Meyer's proposal. It did contain the general reference "Confirming Verbal Order of 8–11–78 Per Your Proposal # 780049 of 7–16–78." In response, Meyer issued a "Sales Acknowledgment" showing an "acceptance date" of September 5, 1978 and providing a statement of the "Basis of Acceptance" which included the "Meyer Terms and Conditions of Sale as stated in Proposal 780049 dated July 6, 1978." On the reverse side of the acknowledgment appeared the "Terms and Conditions of Sale. Meyer Industries." Among those listed was "Item 16." NSP made no additional response, and the parties proceeded to carry out the contract.

In December, 1978, the screw anchors were manufactured and in February and March of 1979, about 1,000 were emplaced in the ground by NSP contractors. About five months later, aluminum power line towers were flown into place and attached by guy wires to the anchors.

In late September, shortly after the guy wires were tightened and the installation completed, four towers fell to the ground. In each case a coupling at the end of a screw anchor extension had come apart at the weld.

NSP asserts that Meyer was immediately apprised of the fallen towers and that it learned shortly thereafter that tests conducted by Twin City Testing showed the anchors were defective. NSP claims Meyer failed to take remedial action at its own cost and denied that the anchors were defective.

Two or three weeks after the towers fell, NSP determined that all of the previously installed screw anchors needed repair by replacing the welded couplings with a bolted connector. NSP had contractors remove each anchor and had various other contractors, including defendant, replace the welded couplings. The anchors were then reinstalled.

**3.** Presumably a reference to NSP's "Request    for Quotation."

NSP claims a total cost of repair of $2,404,016, including approximately $100,000 in cost to repair the damaged towers. The total cost breaks down as follows: NSP's own labor, transportation and equipment rental costs $148,647; contract labor costs for anchor removal, repair of damaged towers, transportation and installation of modified anchors—$731,093; material rework including material costs, heat treatment, testing, galvanizing, transportation—$316,545; contract cost with ITT for reworking—$207,731. NSP seeks to recover these costs, together with interest, costs, and attorney's fees in this lawsuit.

*Discussion*

1. *Motion to Dismiss Plaintiff's Tort Claims*

■ ITT bases its motion to dismiss plaintiff's tort claims upon the ground that *Superwood ▸ Corporation v. Siempelkamp Corporation,* 311 N.W.2d 159 (Minn.1981), bars recovery of tort damages for actions arising from a commercial transaction primarily involving economic loss. This decision of the Minnesota Supreme Court is being frequently cited for a variety of propositions. Its import and precedential value are a topic of debate.[4]

*Superwood* was an action for losses sustained by a manufacturing business as a result of the failure of a cylinder in a hot plate press. Plaintiff sought damages under theories of warranty, contract, negligence, and strict tort liability. The court held that plaintiff's tort theories were precluded, saying

that economic losses that arise out of commercial transactions, except those involving personal injury or damage to other property, are not recoverable under the tort theories of negligence or strict products liability.

311 N.W.2d at 162.

This case differs from *Superwood* in two respects: plaintiff seeks to recover damage to other property in addition to claiming economic loss, and plaintiff alleges tort liability for fraud and misrepresentation.

Although *Superwood* states that its rule is limited to commercial transactions not involving "damage to other property," the court's rationale appears to be much broader. It reasoned that "[t]o allow tort liability in commercial transactions would totally emasculate the [warranty and liability limitation] provisions of the U.C.C. Clearly, the legislature did not intend for tort law to circumvent the statutory scheme of the U.C.C." 311 N.W.2d at 162. The court also noted that "[l]imiting the application of strict products liability to consumers' actions or actions involving personal injury will allow the U.C.C. to satisfy the needs of the commercial sector and still protect the legitimate expectations of the consumers." *Id.*

To allow a plaintiff to recover over two million dollars in negligence or strict liability because of some $100,000 in damage to the fallen towers[5] would appear to thwart the policy implications of *Superwood,* and application of its rule here limits plaintiff's recovery for negligence or strict liability to the damage sustained to other property,[6] one of the explicit exceptions to the rule.

■ Defendant also seeks to have *Superwood* applied as a bar to all tort claims. ITT has shown no reason, other than some broad dicta used in the opinion, to extend the *Superwood* rule to bar claims for misrepresentation and fraudulent inducement to contract. *Superwood* only limited the

---

4. Recently the Minnesota court had occasion in *Wolner v. Mahaska Industries, Inc.,* 325 N.W.2d 39, No. 82–3 (filed Oct. 22, 1982), to determine whether *Superwood* should be applied retroactively. The court's references to the *Superwood* rule in dicta do not resolve other issues.

5. The parties agree that this item of recovery constitutes "damage to other property." The

parties dispute whether other items of damage may also be so characterized.

6. A fuller exposition of the relevant facts at trial would be helpful to the proper resolution of the issue of whether other items of damage than the fallen towers constitute "damage to other property."

use of negligence and strict liability, the tort theories most commonly used in the consumer/personal injury setting. At best, it is arguable that recovery for merely negligent misrepresentation should not be allowed since *Superwood* disallowed negligence actions for economic loss in commercial transactions. Misrepresentation is a distinct tort, however, and *Superwood* did not address whether this right of action should be discontinued in commercial settings. It is well established in Minnesota that claims for fraudulent inducement to contract and misrepresentation may be brought in addition to claims in contract and warranty. *See e.g. Clements Auto Co. v. Service Bureau Corp.,* 444 F.2d 169 (8th Cir.1971); *Fischer v. Division West Chinchilla Ranch,* 310 F.Supp. 424 (D.Minn. 1970); *General Corp. v. General Motors Corp.,* 184 F.Supp. 231 (D.Minn.1960). *Superwood* did not mention this line of cases, and this court sees no reason to read that case to bar all tort recovery.

2. *Defendant's Motion to Dismiss Plaintiff's Contract Claims for Consequential Damages*

█ ITT contends it is entitled to partial summary judgment dismissing plaintiff's claims for consequential damages because of the contract provision, so-called Item 16, which contains a limitation of liability including an exclusion of recovery of consequential damages.

NSP argues that the limitation of liability section is not part of the contract under Minn.Stat. § 336.2–207 because the clause differs from NSP's offer and would materially alter the parties' contract. This statute provides that additional, material terms included in an acceptance between merchants are not a counter offer, but are to be construed as proposals and do not become part of the contract. *See* Minn.Stat. § 336.2–207(2)(b).

NSP's "purchase order" is the form most appropriately considered to be the offer, and Meyer's "sale acknowledgment" the acceptance. The purchase order (offer) makes no express reference to the limitation of liability clause. The sales acknowledgment (acceptance) does contain the clause, but this reference to the clause does not necessarily mean the acknowledgment varies from the terms of the purchase order. Prior to the purchase order Meyer had submitted a proposal that included a special reference to the limitation of liability clause, and NSP had placed a verbal order during discussions between the parties. The subsequent purchase order could be merely a written verification of the verbal order; it made express reference to Meyer's proposal. The purchase order stated:

CONFIRMING VERBAL ORDER of 8–11–78

PER YOUR PROPOSAL # 780049 OF 7–6–78

On this record the trier of fact could find the limitation of liability clause part of the contract between the parties. Nearly identical circumstances were presented in *Ewing Brothers v. Ball Computer Products, Inc.,* 148 Ga.App. 410, 251 S.E.2d 347 (1978), where an offer's reference to the terms of a prior quotation was held to include those terms in the offer, and a later acceptance reiterating the terms did not vary from the offer, requiring application of U.C.C. § 2–207(2).

NSP also argues that even if the liability limitation is considered part of the contract, it must fail either because it is unconscionable under Minn.Stat. § 336.2–302, or caused by circumstances to fail in its essential purpose under Minn.Stat. § 336.2–719.

There is no basis for finding the limitation of remedy clause unconscionable. There is no personal injury involved and no inequality of bargaining power between the parties. The parties to the contract are large businesses fully capable of negotiating an agreement each can live with.

█ The parties disagree as to whether or not NSP may properly seek consequential damages if the limitation clause were found to have failed in its essential purpose. Under Minnesota law, if the clause failed in its essential purpose, the plaintiff is entitled to recover consequential and other dam-

ages. *See e.g. Soo Line Railroad Co. v. Fruehauf Corp.,* 547 F.2d 1365 (8th Cir. 1977). ITT contends, however, that the contract must be construed under New York law and that New York law provides that an exclusion of consequential damages remains in effect even if the limitation of remedy fails in its essential purpose.

▇ Choice of law principles favor application of Minnesota law to this contract. The conflict of law rules of the forum state control which substantive law should apply. *Medtronic, Inc. v. Gibbons,* 684 F.2d 565 (8th Cir.1982). Minn.Stat. § 336.1–105 provides such choice of law provisions are effective "when a transaction bears a reasonable relation" to the state selected.[7] *Accord Restatement (Second) of Conflict of Laws,* § 187 (1971). The only contact with New York is that ITT, the parent corporation of Meyer, has its principal place of business in New York. ITT cites no other basis for the choice. The U.C.C. Comment 1 to § 1–105 states:

> Ordinarily the law chosen must be that of a jurisdiction where a significant enough portion of the making or performance of the contract is to occur or occurs. But an agreement as to choice of law may sometimes take effect as a shorthand expression of the intent of the parties as to matters governed by their agreement
> . . . .

There is no showing that the inclusion of the choice of law provision was knowingly negotiated as an expression of the parties' intent on matters governed by the contract. Since both NSP and Meyer were located in Minnesota, and the contract was negotiated and performed in this area, New York has no reasonable relation to the parties' transaction, and Minnesota law should govern.

As noted earlier, the Minnesota rule permits the recovery of consequential damages if the limitation of liability fails in its essential purpose. Since there is an issue of fact on this point, summary judgment dismissing plaintiff's claims for consequential damages is inappropriate.

---

**7.** Defendant supports enforcement of the choice of law provision by relying on a Minnesota case not decided under Minn.Stat. § 336.-

**ORDER**

Accordingly, based upon the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1. Defendant's motion to dismiss plaintiff's tort claims for failure to state a claim is denied.

2. Defendant's motion for partial summary judgment dismissing plaintiff's claims for consequential damages is denied.

3. Plaintiff is limited in its recovery for negligence and strict liability in tort to damages permitted under the rule of *Superwood Corporation v. Siempelkamp Corporation,* 311 N.W.2d 159 (Minn.1981), as discussed above.

1–105 and which does not consider the issue of the chosen forum's relation to the parties' agreement.