MINNEAPOLIS SOCIETY OF FINE ARTS, Respondent,

v.

PARKER–KLEIN ASSOCIATES ARCHITECTS, INC., et al., Defendants,

The Hanley Company, Appellant.

No. C7–83–446.

Supreme Court of Minnesota.

Aug. 31, 1984.

Rehearing Denied Oct. 10, 1984.

John L. Krenn, Minneapolis, Charles Weiss, J. Frank McKenna, Pittsburgh, Pa., for appellant.

Maclay R. Hyde, Rebecca Egge Moos, Laurence R. Waldoch, Minneapolis, for respondent.

KELLEY, Justice.

The Minneapolis Society of Fine Arts (MSFA), respondent, sued The Hanley Company (Hanley), appellant, and others alleging that Hanley had breached express and implied warranties; had breached its contract to manufacture and supply suitable brick used in the construction of buildings owned by MSFA; was negligent in manufacturing the brick; and was strictly liable for supplying defective brick, unreasonably dangerous to the property of MSFA. The trial court ruled Hanley had not breached any express warranty. The jury found that the Hanley brick was not in a condition unreasonably dangerous to the property of MSFA; that the brick was merchantable and fit for the purpose required; and that Hanley did not breach its agreement to deliver brick complying with American Society of Testing Materials (ASTM) specifications. The jury did find Hanley causally negligent "in the matter of the planning, design, construction and the furnishing of labor and materials." The trial court entered judgment against Hanley on the jury verdict.[1]

Following denial of post-trial motions, Hanley on appeal contends that in a commercial transaction, a purchaser of building materials may not recover in negligence or strict liability from the supplier the cost of repairing and replacing a portion of the structures into which the materials were incorporated. Respondent MSFA appeals from certain trial court rulings, including its refusal to submit the issue of alleged punitive damages to the jury. We reverse and order entry of judgment for appellant Hanley.

1. Originally, there were eight defendants. Before verdict, seven defendants had settled claims against them. The jury found MSFA damages of $6,500,000 (later reduced by the trial judge to $6,037,000). The jury apportioned fault 27% to the architect, 12% to each of the other six defendants, including Hanley, and 1% to MSFA. Judgment was entered against Hanley in the amount of $724,440.

MSFA began a $25 million expansion project in the mid-1960's to add two wings to the Minneapolis Institute of Arts building and to construct two new buildings to house the Children's Theater and the Minneapolis College of Art and Design. MSFA retained a Japanese architect and a local architectural firm to design the new additions. The architects retained a structural engineering firm to provide structural design services. MSFA also engaged a construction management company to oversee construction and two construction companies to carry out the construction.

By 1971, the architects had selected white glazed brick for use on exterior and on some interior walls. Hanley, a manufacturer of glazed brick, learned of the MSFA project in early 1972 through its local distributor, Ochs Brick and Tile Co. (Ochs). Matching samples of brick submitted to it by the architects, Hanley forwarded samples of its own brick to the architects, and its regional sales manager met with the architects on several occasions to present Hanley brick and attempt to secure a sale. Prior to making the bid and furnishing the brick and before the installation on the exterior walls, Hanley never had access to the plans and specifications of the wall construction. The only specifications furnished to Hanley were ASTM brick specifications.

Ultimately, MSFA issued a purchase order to Ochs for purchase of 1.8 million Hanley white glazed brick meeting ASTM specifications C126-7 and C67-66. Ochs, in turn, issued its purchase order to Hanley for the brick. Hanley subsequently shipped the brick. The final delivery of Hanley brick for the MSFA project was made in October 1974. Total cost of the Hanley brick was $248,000. Construction of the project was completed in late 1974.

Problems with the brick developed almost immediately. By July 1975, MSFA had become aware of deterioration of the Hanley brick used on the exterior walls. During a period from 1975 through 1979, the brick continued to crack, craze and spall, and MSFA hired the Minnesota Masonry Institute to investigate the brick condition. During this time, MSFA also met with the architects and representatives of the construction companies and Hanley to determine the cause of the deterioration, to discuss remedial measures and to fix responsibility for the brick failure. Remedial work began in mid-1982 and consisted of removal of the exterior brick walls and replacement with white glazed brick manufactured by a different company. Although the brick used in repair was essentially the same as the Hanley brick, the repair work required redesign of the exterior building walls in conformance with industry standards. By October 1982, MSFA estimated the necessary remedial work would cost approximately $6 million.

Glazed brick have a ceramic face over a clay body. Since the ceramic is impermeable, water cannot pass in or out and the brick is unable to "breathe" through the brick front. If water is not prevented from entering the brick and means of escape is not provided for water that permeates the brick, water becomes trapped within and causes disintegration of the brick through freeze/thaw action and moisture expansion. Recognizing the sensitive nature of glazed brick, the Brick Institute of America (BIA) issued Technical Note 13 in May 1962 recommending design specifications for use with ceramic glazed brick in exterior walls. BIA Technical Note 13 recommended six design features applicable in severe weather areas: (1) cavity wall construction (a 2-inch air space left between the brick and back-up wall which allows the brick to breathe from behind); (2) vapor barrier on warm side of cavity; (3) a ventilated cavity for free standing walls; (4) adequate flashing (flexible metal or plastic installed in the cavity of a brick wall to direct water to the exterior); (5) adequate expansion joints; and (6) flexible anchorage to columns and beams.

There is no dispute that the design of the buildings failed to conform to Technical Note 13 and that this failure contributed substantially to deterioration of the walls. Expert witnesses testified that erroneous

design and construction errors caused deterioration of the brick. In particular, the absence of a cavity wall, which would have allowed the brick to "breathe" from behind, inadequate or concealed flashing, insufficient expansion joints, rigid connection of the masonry to the steel structural frame, lack of weepholes, and use of horizontal and inclined surfaces contributed to the deterioration. In addition, Hanley's experts testified that many of the expansion joints and weepholes were filled with mortar which prevented the brick from breathing. Likewise, MSFA's expert, Clarence Monk, testified that the lack of a cavity wall, weepholes and expansion joints contributed to the brick deterioration. Other witnesses for MSFA agreed that inadequate flashing, lack of expansion joints, and nonconformance with Technical Note 13 contributed to the problem.

The jury found the Hanley brick were not themselves defective. MSFA does not challenge that finding on appeal. MSFA does contend, however, that Hanley had a duty to warn MSFA or its agents of the recommendations contained in BIA Technical Note 13 which had been issued 10 years before construction of the MSFA project. Although Hanley's regional sales manager met with the architects prior to the sale and knew the brick would be used for both interior and exterior walls, he did not discuss specific design details nor did he inform them of Technical Note 13.

However, in late 1972 Hanley's production superintendent received sketches from the architects for special-shape brick that had to be formed and cut by hand to match desired specifications. These sketches indicated that this special brick was to be used in garden walls (e.g., planters) and parapets. A vice president of Hanley wrote the architects to offer construction suggestions for the "garden type walls" which were susceptible to failure from distintegration. He recommended that cavity wall construction be used with weepholes, adequate

flashing and complete filling of all joints if the walls were to remain "trouble free." By that time, the exterior walls already had been started, and it was too late for the architects to incorporate Hanley's design recommendations fully into the exterior curtain walls of the building. MSFA asserts Hanley should have given this warning earlier, not only with respect to the garden walls, but with respect to the exterior curtain walls as well.

1. Adopting the "economic loss" rule followed by a majority of the jurisdictions,[2] we held in *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159 (Minn.1981), that "economic losses that arise out of commercial transactions, except those involving personal injury or damage to other property, are not recoverable under the tort theories of negligence or strict products liability." *Id.* at 162. The rationale for prohibiting tort liability recovery in commercial transactions is that to do so would emasculate certain provisions of the Uniform Commercial Code. *Id.* at 162.

Thus, *Superwood* proscribes recovery of "economic loss" unless the damage is to "other property." The MSFA contends that the Hanley brick caused damage to "other property"—in particular, to the buildings into which the brick were incorporated, the mortar, labor and cement blocks. Hanley responds that the gradual deterioration of brick affected only property which was contemplated within the commercial transaction and that no "other property" was involved.

*Superwood* provides little guidance in construing the term "other property." It has been noted that the line between nonrecoverable economic loss and recoverable property damage is not always easy to draw. *See, e.g.,* Bland & Wattson, *Property Damage Caused by Defective Products: What Losses are Recoverable?*, 9 Wm. Mitchell L.Rev. 1, 4 (1984). Those authors have suggested that "economic loss" results from defects in the quality of the

---

**2.** *See* cases cited in *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159, 161, n. 6 (Minn. 1981). *See also* Bland & Wattson, *Property*

*Damage Caused by Defective Products: What Losses are Recoverable?*, 9 Wm. Mitchell L.Rev. 1, 4 (1984).

product which cause damage, while losses caused by non-qualitative defects are "non-economic." *Id.* at 5. Other jurisdictions have held that where a defect in a component part damaged the product into which that component was incorporated, economic losses to the product as a whole were not losses to "other property" and therefore not recoverable. *See, e.g., R.W. Murray Co. v. Shatterproof Glass Corp.*, 697 F.2d 818, 829 n. 11 (8th Cir.1983) (court denied claimed damages for diminution in value of building and loss of rental profits allegedly caused by negligent manufacture of glass panels incorporated into office building on grounds such claims were only for "economic loss"); *Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 626 F.2d 280 (3d Cir.1980) (Johns-Mansville had supplied defective roofing products and design resulting in substantial repair and replacement costs but recovery was denied under tort theories because such losses were "economic losses"); *Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc.*, 572 S.W.2d 308 (Tex.1978) (court denied recovery for damage sustained by airplane in crash resulting from engine defect where no physical injury to persons or other property had occurred).

■ Although MSFA contends that the buildings apart from the brick itself have been physically damaged, the record does not support its claim. Hanley glazed brick was used for non-load-bearing curtain walls. Remedial work consisted of removal and replacement of these curtain walls. This was accomplished without affecting the underlying structure.

■ The only damage evidence presented by MSFA was that the buildings had diminished in value by approximately $6,694,000. This figure was arrived at by adding the cost of cure ($5,817,000) (the cost of removing and replacing the brick, architectural fees incurred in the repair, interim protective measure costs, and equipment costs); the diagnosis cost ($220,000); lost revenue resulting from construction activities ($49,000); and 10% contingency funds for unforeseen problems ($608,500). These figures reflect no consideration for physical damage to the buildings themselves. As in *Jones & Laughlin* and *Shatterproof Glass*, MSFA has failed to prove physical damage to property other than the brick itself.[3] To hold that buildings constitute "other property" would effectively overrule *Superwood* as to every seller of basic building materials such as concrete, brick or steel because the "other property" exception would always apply. The UCC provisions as applicable to component suppliers would be totally emasculated.[4]

Generally, "economic loss" has been defined as resulting from the failure of the product to perform to the level expected by the buyer and commonly has been meas-

---

**3.** The MSFA relies on a number of insurance cases to support its contention that "other property" has been damaged. *See, e.g., Hauenstein v. St. Paul-Mercury Indemnity Co.*, 242 Minn. 354, 65 N.W.2d 122 (1954); *Dakota Block Co. v. Western Casualty & Surety Co.*, 81 S.D. 213, 132 N.W.2d 826 (S.D.1965); *Western Casualty & Surety Co. v. Polar Panel Co.*, 457 F.2d 957 (8th Cir.1972). In each of these cases, a manufacturer had sold a defective product subsequently incorporated into a building or other property. None of these cases dealt with a determination of whether or not a manufacturer could be held liable for damages resulting from its defective product. Instead, these cases dealt with property damage liability insurance coverage and required the courts to determine whether, given the manufacturer's liability, the insurer was obligated to pay under the particular policy. Each case involved interpretation of specific, often

ambiguous, policy exclusions. These cases are not controlling on this court's present broader consideration of the distinction between tort and contract liability after *Superwood.*

**4.** In this case, the failure of the brick damaged the mortar as well. Admittedly, the mortar could be characterized as "other property." No breakdown of repair costs was given, so there is no way of knowing the cost of replacing the mortar. Obviously, this cost is only a fraction of the $6.6 million claimed by the MSFA in damages. To allow the MSFA to sue in tort to recover over $6 million in damages because of relatively minor damages to the mortar would thwart the policy implications of *Superwood. Northern States Power Co. v. International Tel. & Tel. Corp.*, 550 F.Supp. 108, 111 (D.Minn.1982).

ured by the cost of repairing or replacing the product and the consequent loss of profits, or by the diminution in value of the product because it does not work for the general purposes for which it was manufactured and sold. *See* Comment, *Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages—Tort or Contract?*, 114 U.Pa.L.Rev. 539, 541 (1966); Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum.L.Rev. 917, 918 (1966). The damages sought in this case by MSFA for removal and replacement of the brick and other consequential loss fall squarely within this "economic loss" definition. As such, they were recoverable in contract, if at all. Since the trial court ruled there was no breach of an express warranty and the jury found no breach of implied warranties, the rule of *Superwood* precludes their recovery in this case.

We need not determine here whether such damages, under certain circumstances not here existing, will ever be recoverable in tort. In passing, we note that other courts have focused not on whether damage has occurred to "other property," but instead on the nature of the defect and the manner in which the damage occurred. *See Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165 (3rd Cir.1981); *Sanco, Inc. v. Ford Motor Co.*, 579 F.Supp. 893 (S.D.Ind.1984); *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982); *Industrial Uniform Rental Co. v. International Harvester Co.*, 317 Pa.Super. 65, 463 A.2d 1085 (1983). Where the damage results from deterioration, internal breakage, depreciation, or failure to live up to expectation, these courts would allow recovery only on a contract or warranty theory. Where the damage results from hazardous conditions or a sudden and calamitous occurrence, however, these courts would allow recovery under a tort theory. The rationale for this distinction is that tort law imposes a duty on manufacturers to produce safe products, regardless of whether the ultimate impact of the hazard is on people, other property, or the product itself. *Pennsylvania Glass*, 652 F.2d at 1173. Contract or warranty law, on the other hand, has been traditionally concerned with redress of a purchaser's disappointed expectations. *Id.* at 1172; *Sanco*, 579 F.Supp. at 897.

In the present case, no sudden or calamitous event caused the brick deterioration. Rather, the brick did not meet MSFA's expectations and gradually deteriorated. Thus, the "expectation-bargain protection policy of warranty law" and not the "safety-insurance policy of tort law" is more applicable to the MSFA's claims. *Pennsylvania Glass*, 652 F.2d at 1173.

2. MSFA claims that Hanley should still be liable in negligence for its failure to give timely instructions that the brick was subject to failure because of water problems resulting if the walls into which it was incorporated were not properly constructed to allow the brick to "breathe." MSFA argues that *Superwood* should not preclude its negligence action because it is not a disappointed purchaser whose brick failed to perform satisfactorily, but the victim of Hanley's negligence in failing to warn of the sensitivity of its brick, negligence which arose independent of contract.

 Generally, there is no duty to warn if the user knows or should know of potential danger. *Strong v. E.I. Dupont de Nemours Co.*, 667 F.2d 682 (8th Cir. 1981); *Thibodaux v. McWane Cast Iron Pipe Co.*, 381 F.2d 491 (5th Cir.1967). In the present case the evidence was overwhelming that the architects employed by MSFA should have known that severe weathering could damage glazed brick curtain walls unless precautions set forth in Technical Note 13 were followed. Moreover, Technical Note 13 itself advised architects to consult with glazed brick manufacturers when intending to use ceramic brick for exterior use.[5] They failed to do so. In

5. BIA Technical Note 13 contained the following recommendation:

addition, MSFA's own experts testified that construction custom and practice required the architect to initiate contact with the manufacturer. Under these circumstances, we conclude there existed no duty on Hanley to warn of potential problems with glazed brick when they were not shown plans and specifications for the project prior to construction. Hanley was justified in relying on the architects and builders to properly apply the brick in accordance with industry standards and BIA Technical Note 13.

■ MSFA also contends that Hanley failed to warn that its brick had failed in the past. The evidence indicated that in the 10 years prior to 1972, Hanley "booked" 4,238 glazed brick orders and shipped over 173 million glazed brick—the great bulk of which went into exterior walls in severe weather condition areas. During that same period, Hanley received eight inquiries concerning spalling of its glazed brick. Each inquiry, after investigation, showed the problem was found to stem from an excessive influx of water. In connection with any of those eight inquiries, no formal claim has ever been made against Hanley. All eight inquiries related to spalled glazed brick involved in relatively small wall areas or a small number of brick. After the owners, on advice of Hanley, stopped the water problem, the brick ceased spalling. There is simply an absence of any evidence that a disclosure of a very small scattering of minor brick failures would have prevented, or was related to, the problems with MSFA's buildings.

■ In essence, MSFA urges us to make Hanley absolute warrantor of its brick even though trained architects, who should have had knowledge of industry standards, selected the brick and designed the walls, and experienced engineers oversaw the

construction. Had MSFA wanted this total protection, it should have bargained for an express warranty that Hanley brick would meet MSFA construction and design demands. While a manufacturer can insure its products will meet the needs of its customers, a manufacturer should not be held for the level of performance of its products in the consumer's business unless it so agrees. *See Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965).

Absent an "unreasonably dangerous condition" created by a manufacturer's failure to warn which the jury determined was not here present, or absent misrepresentations made by the manufacturer which MSFA has not here alleged, the action for failure to warn of the sensitive nature of the brick is precluded by warranty or contract law, which provides the only remedies for a consumer's disappointed expectations.

Accordingly, we hold that "economic losses" that arise out of commercial transactions, except those involving personal injury or loss to other property, are not recoverable under the tort theories of negligence or strict product liability. Damage to the brick on MSFA's curtain wall construction was not damage to "other property," but such damages were recoverable, if at all, under the "expectation-bargain" protection of contract law. Since the trial court found no breach of warranties, express or implied, MSFA may not recover such costs of cure damages. In any event, we further hold that Hanley owed no tort duty to warn MSFA or its architects and construction engineers of proper design of the building walls because the architects and engineers knew, or should have known, the danger of spalling if a recognized proper wall design was not employed in this severe weather area. Finally, we hold

The Specifications of the Facing Tile Institute for Select Quality Ceramic Glaze Structural Facing Tile, dated November 1959, provide: "Where ceramic glaze units are required for exterior use, the manufacturers should be consulted for material suitable for this purpose."

Specifiers of ceramic glazed brick for exterior use are urged to comply with this recommendation and, in so doing, to indicate to the manufacturers the geographic location of the project, the type of construction, that is, enclosure walls, parapets, etc., and the wall design, including flashing details and mortar specified.

Hanley breached no tort duty to inform the MSFA or its agents that on eight minor occasions its glazed brick had spalled when proper protection against water influx had not been provided by construction people, and that, as a matter of law, failure to so inform could not be a legal cause of the damage to MSFA. We reverse and remand to the trial court for entry of judgment in favor of appellant.

Reversed and remanded.

COYNE, J., took no part in the consideration or decision of this case.