Conrad HAPKA, individually, Brian Hapka, individually, and Conrad and Brian Hapka, Appellants,

v.

PAQUIN FARMS, et al., Gust Hangsleben, Minnesota Department of Agriculture, Respondents.

No. C4–88–410.

Court of Appeals of Minnesota.

Nov. 29, 1988.

Review Granted Jan. 26, 1989.

Mark E. O'Boyle, Dickel, Johannson, Taylor, & Rust, P.A., Crookston, for appellants.

Dennis M. Sobolik, Roger C. Malm, Brink, Sobolik, Severson, Vroom & Malm, P.A., Hallock, for respondents, Paquin Farms, et al.

Donald Leonard, East Grand Forks, for respondent, Gust Hangsleben.

Hubert H. Humphrey, III, Atty. Gen., Paul A. Strandberg, Sp. Asst. Atty. Gen., St. Paul, for respondent, Minnesota Dept. of Agriculture.

Heard, considered and decided by CRIPPEN, P.J., FORSBERG and LOMMEN,* JJ.

## OPINION

FORSBERG, Judge.

Appellants Conrad and Brian Hapka (Hapkas), purchasers of certified potato seed, brought an action against respondents Paquin Farms, Paquin Potato Company, Richard Paquin, David Paquin (Paquins), P & H Farms, and Gust Hangsleben, sellers, seeking damages for losses sustained when the seed purchased was infected with bacterial ring rot. Appellants also brought suit against the State of Minnesota inspectors for failure to inspect the seed properly before the purchase and secure compliance with the requirements of Minnesota's certified seed program.

The matter was tried before a jury and at the close of the evidence, the trial court granted the State of Minnesota's motion

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

for a directed verdict. The court denied appellants' motion for a directed verdict, and also refused to grant appellants' request that the jury be instructed on the theories of negligence, negligence per se, and strict liability. The issues of misrepresentation and breach of express and implied warranties were submitted to the jury. The jury found in favor of respondents. We affirm.

## FACTS

In 1983, the Hapkas farmed individually and in partnership with one another. The Paquins operated Paquin Farms, Inc., which is a family farm corporation, and Paquin Potato Company, a company which was formed to market potatoes grown by them.

The State of Minnesota, Department of Agriculture, publishes and distributes to potato growers a directory each year which shows the names of potato growers who participate in the state certification program. In the spring of 1983, the directory issued by the Department of Agriculture listed Conrad Hapka and Brian Hapka as growers of certified potatoes. It also listed Paquin Farms, Inc., and P & H Farms as growers of certified potatoes.

In April 1983, Conrad Hapka contacted Paquin Farms in regard to buying some foundation Kennebec seed. Hapka had been purchasing certified seed from the Paquins for a number of years. He also asked about the availability of some Norchip seed, but Paquins told him that they had no Norchip seed at that time.

Paquin Farms is owned and operated by brothers, Richard and David Paquin. P & H Farms is owned by the Paquin brothers and Gust Hangsleben. The Paquin brothers, however, have asserted that they did all the work involved with P & H Farms and took care of the business. Paquin Farms are suppliers of various approved certified and foundation potato seed. P & H Farms are suppliers of approved certified Norchip potato seed. There is a distinction between approved certified and foundation seed.

Sometime early in the growing season of 1983, Conrad Hapka began planting some of his own Kennebec seed. This was seed potato that he had stored from the 1982 crop. Sometime later, he picked up the new Kennebec seed he obtained from Paquin Farms and, likewise, planted this seed. As he was picking up the seed from the Paquins, he was told that they now had some Norchip seed available and that he could pick it up as he needed it.

The Hapkas picked up the first of the Norchip seed on May 30, 1983 (Memorial Day) at the Mentor warehouse; the place where they normally picked up their Paquin seed. Conrad contended that since he picked up the Kennebec seed there, he had assumed that the Norchip seed he was picking up was Paquin Farm seed too. The Paquins assert that the Norchip seed had been in the Brooks (P & H Farms) warehouse but had been transferred to the Mentor (Paquin Farms) warehouse earlier. Conrad Hapka also contends there were no state inspectors present when he picked up the seed, but that he was not concerned at that point.

The Hapkas went back and picked up the second load on the following day. Again, there was no state inspector present. Richard Paquin took the samples of the seed himself, which he later submitted to state inspectors. Richard stated that the Hapkas gave him only a few hours notice before they arrived to pick up the seed, but had they asked for an inspector he would have called one in, even if it was Memorial Day. He also stated that his taking of random samples from the graded potatoes was acceptable. Richard submitted the samples to inspection the next day and there wasn't any indication of ring rot being present.

Conrad alleges that he was not aware that he was buying P & H seed until after he received the inspection documents. Richard Paquin alleges that Hapka should have known what kind of seed he was

getting because the directory of their business lists the fact that P & H Farms grew only approved certified Norchips, and not foundation Norchips.

Minnesota's Department of Agriculture inspections take place after the seed potatoes are in the ground. At that point the seed potatoes are to be examined at least twice in the field and again after harvest.

The Hapkas' potato crop was found to have ring rot, leaving the Hapkas unable to sell their crop as certified seed. In addition to losing a higher classification and sale value for their crop, the Hapkas had to contend with the extra work and expense of sanitizing their fields and equipment in an attempt to wipe out any residue of ring rot so that the disease would not affect any of their future crops.

The Hapkas said that had they known it was P & H and not Paquin seed, they would not have bought it.

The case went to trial and the jury returned a finding of $109,066.00 in damages. The jury, however, failed to find that the Paquins were guilty of misrepresentation of an express warranty, nor did they find that the Paquins breached an implied warranty. The Hapkas appeal.

### ISSUES

1. Did the court err in refusing to instruct the jury on the theories of negligence, negligence per se, and strict liability?

2. Were appellants denied a fair trial because of alleged misconduct of respondents' counsel?

3. Did the court err in directing a verdict in favor of the state?

### ANALYSIS

#### I.

■ The trial court refused to submit tort theories based on *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159 (Minn.1981). We agree. In that case the court held that

economic losses that arise out of commercial transactions, except those involving personal injury or damage to other property, are not recoverable under the tort theories of negligence or strict products liability.

*Id.* at 162. Appellants contend that in this case there was damage to "other property" making *Superwood* inapplicable. In *Minneapolis Society of Fine Arts v. Parker-Klein Associates Architects, Inc.*, 354 N.W.2d 816 (Minn.1984), the court said:

In passing, we note that other courts have focused not on whether damage has occurred to "other property," but instead on the nature of the defect and the manner in which the damage occurred. * * * *Where the damage results from deterioration, internal breakage, depreciation, or failure to live up to expectation, these courts would allow recovery only on a contract or warranty theory. Where the damage results from hazard conditions or a sudden and calamitous occurrence, however, these courts would allow recovery under a tort theory.* The rationale for this distinction is that tort law imposes a duty on manufacturers to produce safe products, regardless of whether the ultimate impact of the hazard is on people, other property, or the product itself. * * * Contract or warranty law, on the other hand, has been traditionally concerned with redress of a purchaser's disappointed expectations.

*Id.* at 821 (citations omitted) (emphasis added). In the instant case, it seems clear that this is a product which "failed to live up to expectations" not a sudden or calamitous occurrence. There is not damage to "other property" within the meaning of the *Superwood* exception.

■ In regard to appellants' motion for judgment notwithstanding the verdict, there was clearly enough evidence to justify the jury verdict. All witnesses testifying in the trial concerning the risk of disease were uniform in their testimony that a grower simply cannot guarantee potatoes to be totally disease-free and that the buyer assumes the risk. Dr. Zink further testi-

fied that it was his opinion that the department could not reach a point where it could ever warrant or guarantee that potatoes were absolutely free from disease. He testified that it would be necessary to destroy each and every potato to sample it and test it. Secondly, he testified that scientists simply have not developed the type of tests with sensitivity sufficient enough for the tester to state that there is absence of a disease. Moreover, lack of certification does not mean that the seed cannot be sold or used. In fact the seed was sold by appellants as "select seed."

## II.

Appellants claim that the state was negligent in informing the Paquins that they themselves, as the sellers of certified seed, could take the sample and submit it to the state in substitution for the requisite shipping point inspection. The state argues that appellants have failed to point out any state and federal law or regulation which was violated by the sampling procedure followed in this case. We agree. Moreover, there is no evidence that the state refused or neglected to conduct an inspection. And, finally, it would not have mattered even if there had been an on-site inspection. No evidence was introduced to show that the potatoes were bad at the shipping point or that disease symptoms were visible at the sample time. The only testimony was that the potatoes were looking good. Even when every single one of the potatoes in the sample was later cut and closely examined for symptoms of ring rot, no symptoms were found.

## III.

There have been claims of errors committed in various evidentiary rulings. Upon examination, we feel that all rulings were well with the proper discretion of the court and no errors were committed.

### DECISION

AFFIRMED.