**Conrad HAPKA, individually, Brian Hapka, individually, and Conrad and Brian Hapka, Petitioners, Appellants,**

v.

**PAQUIN FARMS, et al., Gust Hangsleben and State of Minnesota, Department of Agriculture, Respondents.**

No. C4–88–410.

Supreme Court of Minnesota.

Aug. 3, 1990.

Robert W. Wattson, Mark E. O'Boyle, Zelle & Larson, Minneapolis, for appellants.

Dennis M. Sobolik, Roger C. Malm, Brink, Sobolik, Severson, Vroom & Malm, P.A., Hallock, for Paquin Farms.

Hubert H. Humphrey, III, Atty. Gen., Paul A. Strandberg, Sp. Asst. Atty. Gen., St. Paul, for State of Minn.

Donald Leonard, East Grand Forks, for Gust Hangsleben.

Minnesota Defense Lawyers Ass'n, Louis A. Dovre, Rider, Bennett, Egan & Arundel, Minneapolis, amicus curiae.

COYNE, Justice.

On petition of plaintiffs Conrad and Brian Hapka, we review the decision of the court of appeals affirming the trial court's declination pursuant to *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159 (Minn.1981), to submit tort theories to the jury in an action for damages resulting from diseased seed potatoes purchased from defendant P & H Farms. *Hapka v. Paquin Farms*, 431 N.W.2d 907, 910 (Minn. App.1988). We affirm.

Minnesota prohibits the planting of seed potatoes unless the seed meets minimum requirements prescribed by the commissioner of the department of agriculture. Minn.Stat. § 21.118 (1982); 3 MCAR § 1.0131 (1982). Compliance with the requirements may be evidenced by certificates of inspection which demonstrate "the varietal purity and the freedom from disease and physical injury" of the certified potatoes, and also contain any other information prescribed by rules promulgated by the commissioner. Minn.Stat. § 21.113 (1982). A certificate of inspection can be issued only if the seed potatoes have been inspected while growing in the field, usually on several occasions during the growing season, and again after harvest at the time of shipment. Minn.Stat. § 21.113; 3 MCAR § 1.0129(A)(1) (1982). Minnesota's inspection program is part of a national effort to eradicate the destructive and highly contagious disease called "bacterial ring rot" from the potato crop. 3 MCAR §§ 1.0127 to 1.0135 (1982). Although the certification rules make provisions to allow the presence of certain diseases at specified low levels, there is a zero tolerance for bacterial ring rot, and the discovery of a single plant in the field or of a single tuber in storage infected with bacterial ring rot causes the rejection of the entire field or lot. 3 MCAR § 1.0129(E). The absence of a finding of ring rot is not to be construed to mean that the field or lot inspected is free from the disease. *Id.* Furthermore, certification does not "represent a warranty of any kind * * * as to the quality of the crop produced from the certified seed potatoes." 3 MCAR § 1.0129(F).

Conrad Hapka and his son Brian are potato farmers in Marshall County, Minnesota.[1] The Hapkas grow seed potatoes to be sold to other farmers for growing various kinds of commercial potatoes. Like the Hapkas, Richard and David Paquin, the principal owners of Paquin Farms, Inc., also enjoyed a good reputation for growing disease-free, high quality seed potatoes, which they marketed through the Paquin Potato Company. On Memorial Day, Monday, May 30, 1983, the Hapkas purchased a truckload of seed potatoes from the Paquins. This load of potatoes, like a subsequent load purchased on the following day, was grown by P & H Farms, a partnership composed of the Paquins and Gust Hangsleben, a farmer whose reputation for growing seed potatoes did not, according to the Hapkas, match that of the Paquins.[2] Neither the Paquins nor the Hapkas arranged for the required shipping point inspection of the seed potatoes purchased on either day; instead, a random sample of seed potatoes was selected from the lot and submitted for state inspection at a later date. Even though the first sale took place on a legal holiday, a state inspector was available upon request, and Conrad Hapka testified that on an earlier occasion he had arranged for an inspection on a Sunday.

The Hapkas planted the seed potatoes immediately. The planting process included cutting the potatoes into smaller pieces for propagation. The machinery used for cutting and planting those seed potatoes was later used for cutting and planting other potatoes bought from a third source and planted in another field. All of the Hapkas' fields passed the first two state inspections. On the third inspection, however, a state inspector found signs of ring rot in the fields planted with P & H Farms seed potatoes and in the fields later planted with seeds from a different source. No ring rot was found in fields planted before Memorial Day. The presence of ring rot

infection was confirmed by a laboratory analysis, and all the infected fields were rejected for certification as seed potatoes.

The evidence was that the P & H seeds purchased by the Hapkas were infected with ring rot, which was spread by the Hapkas' potato cutter to the seed potatoes acquired from another source. Because of the loss of seed certification, the Hapkas were forced to sell most of their potatoes at the much lower price available for potatoes on the commercial market. One load of potatoes could not be sold and had to be destroyed. The Hapkas were also put to the expense of disinfecting and cleaning their farm machinery and warehouses.

The Hapkas sued Paquin Farms, Inc., Paquin Potato Company, P & H Farms, the Paquins individually, Gust Hangsleben,[3] and the Minnesota Department of Agriculture. The Hapkas asserted that the state negligently failed to inspect the seed potatoes and also breached a contractual duty of inspection and then alleged that all other defendants were guilty of misrepresentation, acted negligently, breached both express and implied warranties, and were strictly liable for selling seed potatoes infected with ring rot.

At the close of the evidence, the trial court directed a verdict in favor of the state, ruled that tort theories of negligence and strict products liability were unavailable, and submitted to the jury only questions regarding misrepresentation and warranty. The jury found that no express warranties had been made and that there had been neither misrepresentation nor breach of implied warranty. The court of appeals affirmed judgment in favor of all defendants, and we granted further review.

◼ We first consider the nature and scope of the review obtained by the Hapkas by virtue of their petition for further review pursuant to Rule 117, Minnesota

---

1. Conrad and Brian Hapka farm together as partners. For accounting and record keeping purposes, each had his own fields.

2. Although the Hapkas testified at trial that they believed the seed potatoes they purchased were raised and sold by Paquin Farms, giving rise to

a claim for misrepresentation, the jury found there had been no misrepresentation and that issue is not before us.

3. Hangsleben was dismissed from the suit before trial.

Rules of Civil Appellate Procedure. Among a number of directives of that rule, a petitioning party is required to identify the legal issues and their disposition by the court of appeals and to specify and discuss the criteria justifying review. The Hapkas focused their petition for further review exclusively on the availability of tort theories of liability—negligence and strict products liability—in their action against the sellers of the diseased seed potatoes. The petition contained no reference to their claims that the Minnesota Department of Agriculture had breached a duty of inspection. Even after the state advised that it would not interpose a response to the petition that raised no issues involving the state, the Hapkas made no effort to declare their intention to pursue those issues. Nevertheless, in their brief to this court the Hapkas once again challenged the propriety of the directed verdict in favor of the state. We decline to consider that issue.

Rule 117 not only provides a procedural mechanism by which a petitioner may seek further review of a court of appeals decision by the supreme court, but is designed to facilitate effective appellate review of that petition by imposing on the petitioner a burden of identifying and discussing all critical issues. Certainly, parties cast in the role of respondent are entitled to know that issues relating to them will be raised and, more significantly, this court must be aware of the scope of the review requested.

We are, of course, cognizant of the limited opportunity for discussion of multiple issues in a petition for further review and of the suggestion implicit in the Rules of Civil Appellate Procedure that the art of advocacy is better served by focusing the argument on the issue which best satisfies the criteria for review. Minn.R.Civ.App.P. 117, subd. 2. For that reason, unless the order granting review specifically limits the issues, we customarily allow parties considerable latitude in their presentation of the case. However, this latitude is not without practical limitations.

The claims of sellers' liability and breach of duty by the state, although connected with the diseased seed potatoes, rest on completely different and independent legal theories. The petition, directed only to the issue of the sellers' liability, gave the state no reason to suspect that it would be implicated in this court's review or that it needed to protect its position by filing a response to the petition or a respondent's brief on the merits. It was therefore incumbent upon the Hapkas, particularly under these circumstances, to raise the unrelated question of the state's liability, however succinctly, in order to apprise the state of the necessity to respond and to accord this court the opportunity to limit the issues to be reviewed.

■ We entertain review because, in attempting to reconcile the cumulative pronouncements of this court in *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159 (Minn.1981), and its progeny, the court of appeals has injected yet another element into the already confusing inquiry regarding the applicability and exclusivity of the Uniform Commercial Code to commercial transactions. More specifically, the issues which are before us center on the scope of the holding in *Superwood* and the availability of tort theories of negligence and strict products liability to support an award of damages for economic losses.

*Superwood* presented three questions certified by the federal court pursuant to Minn.Stat. § 480.061 (1988). This court declared that the answer to the questions depended on whether economic losses arising out of commercial transactions are recoverable under negligence and strict products liability theories. Basing its decision on previously demonstrated approval of the rationale of *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), see *Farr v. Armstrong Rubber*, 288 Minn. 83, 93–94, 179 N.W.2d 64, 70–71 (1970), the *Superwood* court said, "[W]e hold that economic losses that arise out of commercial transactions, except those involving personal injury or damage to other property, are not recoverable under the tort theories of negligence or strict products liability." 311 N.W.2d at 162.

Inasmuch as the damages alleged to have resulted from the failure of Super-

wood's 21–year–old hot plate press were limited to damage to the press itself and lost profits, it seems apparent that the exception in the holding for personal injury and damage to other property was not necessary to the decision there. Nevertheless, in several subsequent cases, *Minneapolis Soc'y of Fine Arts v. Parker–Klein Assocs. Architects,* 354 N.W.2d 816, 819 (Minn.1984); *S.J. Groves & Sons Co. v. Aerospatiale Helicopter Corp.,* 374 N.W.2d 431, 433 (Minn.1985); *Valley Farmers' Elevator v. Lindsay Bros.,* 398 N.W.2d 553, 555 (Minn.1987), this court seems to have treated the exception for "other property" as part of the holding. At the same time, the court of appeals, while paying lip service to the exception, so limited the definition of "other property" that it could not apply the exception in any case arising out of a commercial transaction. *See Thofson v. Redex Indus.,* 433 N.W.2d 901, 903 (Minn.App.1988), *pet. for rev. denied* (Minn., Feb. 22, 1989); *Holstad v. Southwestern Porcelain, Inc.,* 421 N.W.2d 371, 375 (Minn.App.1988), *pet. for rev. denied* (Minn., Apr. 28, 1988); *see also American Home Assur. Co. v. Major Tool & Mach. Inc.,* 767 F.2d 446, 447–48 (8th Cir.1985) (applying Minnesota law); *Agristor Leasing v. Guggisberg,* 617 F.Supp. 902, 908 (D.Minn.1985) (applying Minnesota law). Regardless, however, whether the exception for economic losses arising out of personal injury or damage to other property be holding or dicta, the discussion preceding the decision in *Superwood* contemplates an exception applicable to consumer actions only, and an exception applicable to personal injuries or damage to other property arising out of commercial transactions is a non sequitur.

First, the *Superwood* court set out this quotation from *Farr v. Armstrong Rubber,* 288 Minn. at 93–94, 179 N.W.2d at 70–71 (emphasis added in original quotation):

> *The laws of warranty still meet the needs of commercial transactions and function well in a commercial setting. See, Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145. However, the Restatement [section 402A] the-

ory of responsibility more adequately meets the public policy need to protect consumers from the inevitable risks of bodily harm created by mass production and complex marketing conditions. *McCormack v. Hankscraft Co., Inc.,* [278 Minn. 322, 154 N.W.2d 488 (1967)] *supra.*

*Superwood,* 311 N.W.2d at 162. The *Superwood* court went on to say that the U.C.C. includes specific provisions covering warranties, warranty disclaimers, liability limitations, and notice provisions. *Id.*

The court declined, however, to rule that the U.C.C. completely preempted the field of products liability:

> We, however, do not agree that the U.C.C. was intended to preempt the entire area of products liability. Strict products liability developed in large part to fill gaps in the law of sales with respect to consumer purchasers. * * * Limiting the application of strict products liability to consumers' actions or actions involving personal injury will allow the U.C.C. to satisfy the needs of the commercial sector and still protect the legitimate expectations of consumers.

311 N.W.2d at 162 (citations omitted). Although the foregoing language may justify the application of tort theories of negligence and strict products liability in consumer transactions, it simply does not comport with excepting economic losses arising out of personal injury or damage to other property when the setting in which the sale occurred was a commercial transaction. Indeed, making tort theories of recovery available in commercial transactions flies in the face of the court's recognition of the intended purview of the U.C.C.:

> To allow tort liability in commercial transactions would totally emasculate these provisions of the U.C.C. Clearly, the legislature did not intend for tort law to circumvent the statutory scheme of the U.C.C.

*Id.*

Having set the stage for an exception designed to preserve the availability of tort remedies based on negligence and strict

products liability in actions arising out of consumer transactions, the court instead carved out an exception for cases arising out of commercial transactions involving personal injury or damage to other property. The steady stream of litigation attempting to qualify for the exceptional treatment of damage to other property has convinced us that the exception represents a retreat to the common law in derogation of the essence of the Uniform Commercial Code: a complete and independent statutory scheme enacted for the governance of all commercial transactions. The Code itself indicates that the U.C.C. is intended to displace tort liability. The Code contains provision for the recovery of incidental and consequential damages "in a proper case." Minn.Stat. § 336.2–714(3) (1982). "Consequential damages resulting from the seller's breach" are declared to "include * * * (b) injury to person or property proximately resulting from any breach of warranty." Minn.Stat. § 336.2–715(2) (1988). Moreover, Minn.Stat. § 336.2–719(3) (1988) extends even to consumer as well as commercial transactions, dealing with injury to the person in this provision:

Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

In its design, then, the Code not merely permits but also encourages negotiated agreements concerning all aspects of a commercial transaction including warranties, warranty disclaimers, and liability limitations. The foundational assumption of the Code as a whole is that by importing to their negotiations their experience in the marketplace, the reasonable contemplation of sophisticated parties is embodied in the transaction. It is at the time of the contract formation that experienced parties define the product, identify the risks, and negotiate a price of the goods that reflects the relative benefits and risks to each.

Despite the U.C.C. provisions with respect to the limitation of remedies, Minn.

Stat. §§ 336.2–701 to 336.2–725 (1982), we continue to regard the Code remedies as something less than adequate in the ordinary consumer transaction. Generally speaking, a consumer has neither the skill nor the bargaining power to negotiate either warranties or remedies. If a defective coffee pot causes a fire which destroys a consumer's home, the panoply of liability theory should be available to the consumer—strict products liability and negligence as well as breach of warranty—whether or not personal injuries accompany the property damage.

On the other hand, the law is entitled to expect the parties to commercial transactions to be knowledgeable and of relatively equal bargaining power so that warranties can be negotiated to the parties' mutual advantage. Having negotiated the warranties and any limitations of liability, that a defective product causes damage to other property should not defeat the liability parameters the parties have set by opening the door to tort theories of recovery. While there is reason to sacrifice consistency in order to preserve tort remedies for personal injuries arising out of commercial transactions, as well as those arising out of consumer transactions, there is no similar reason in cases of property damage arising out of commercial transactions to heap tort theories of negligence and strict products liability atop those remedies already provided by the U.C.C. Accordingly, in our judgment the Uniform Commercial Code must control exclusively with respect to damages in a commercial transaction which involves property damage only, and any statement or implication to the contrary in *Superwood* and its progeny is hereby expressly overruled. If the Code is to have any efficacy, parties engaged in commercial activity must be able to depend with certainty on the exclusivity of the remedies provided by the Code in the event of a breach of their negotiated agreement.

Affirmed.

YETKA, Justice (dissenting).

I dissent. Because of the damage to "other property" present in this case, I

would, based on the rule set forth in *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159, 162 (Minn.1981), reverse the court of appeals and remand for a new trial on the negligence theories of recovery asserted by appellants.

This case involves the complex and confusing area of the law where contract and tort overlap. The conceptual difference between contract and tort has been cogently described by Dean Prosser as follows:

> The fundamental difference between tort and contract lies in the nature of the interests protected. Tort actions are created to protect the interest in freedom from various kinds of harm. The duties of conduct which give rise to them are imposed by the law, and are based primarily upon social policy, and not necessarily upon the will or intention of the parties. They may be owed to all those within the range of harm, or to some considerable class of people. Contract actions are created to protect the interest in having promises performed. Contract obligations are imposed because of conduct of the parties manifesting consent, and are owed only to the specific individuals named in the contract.

W. Prosser, *Handbook of the Law of Torts* § 92, at 613 (4th ed. 1971) (footnote omitted). In *Superwood*, this court, in an effort to balance the competing interests protected by the law of contract and tort, adopted the rule followed by a majority of jurisdictions[1] and limited tort recovery of economic losses in commercial transactions to situations involving personal injury or damage to "other property." *See Superwood*, 311 N.W.2d at 162; *Minneapolis Soc'y of Fine Arts v. Parker–Klein Assoc. Architects, Inc.*, 354 N.W.2d 816, 819 (Minn.1984).

The *Superwood* rule has been followed in an unbroken line of decisions of this court without so much as a hint that the language allowing tort recovery for damage to "other property" was merely dicta or that it unnecessarily limited the rights and remedies provided by the Uniform Commercial Code. *See Minneapolis Soc'y of Fine Arts*, 354 N.W.2d at 819–20; *S.J. Groves and Sons Co. v. Aerospatiale Helicopter*, 374 N.W.2d 431, 433 (Minn.1985); *Valley Farmer's Elevator v. Lindsay Bros.*, 398 N.W.2d 553, 555 (Minn.1987); *see also Gates Rubber Co. v. Irathane Sys.*, 710 F.2d 501, 502 (8th Cir.1983) (reversing, based on *Superwood*, the trial court's dismissal of a claim). The Minnesota Legislature has also acquiesced in the balance drawn in *Superwood*. I see no legal or public policy reason to abandon the *Superwood* rule in favor of the analysis offered by the majority.

The rationale for the *Superwood* rule was that, unless limited to situations involving personal injury or damage to other property, tort liability in commercial transactions would "emasculate" certain provisions of the Uniform Commercial Code. *Superwood*, 311 N.W.2d at 162; *Minneapolis Soc'y of Fine Arts*, 354 N.W.2d at 819. I dissented in *Superwood* because I believed that there was no basis for the contention that imposing liability for *negligence* would "emasculate" the rights and remedies provided under the UCC. I still believe that the duties of conduct imposed upon merchants by the law of negligence are not so onerous that this court should relieve them of responsibility. In view, however, of the majority's treatment of *Superwood*, I feel compelled to emphasize several additional points.

The law of products liability developed because of recognition that the law of warranty did not adequately protect buyers of products. *See East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865 (1986). The law of products liability in Minnesota is made up of three distinct theories of recovery: warranty,

---

1. *See National Crane Corp. v. Ohio Steel Tube Co.*, 213 Neb. 782, 786, 332 N.W.2d 39, 42 (1983). Some courts that follow this majority rule define "economic loss" as "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—*without any claim of personal injury or damage to other property.*" (Emphasis added) (citation omitted). *See also Jones & Laughlin Steel Corp. v. Johns–Mansville Sales Corp.*, 626 F.2d 280, 284 (3d Cir.1980).

negligence, and strict tort liability. Steenson, *The Anatomy of Products Liability in Minnesota: The Theories of Recovery*, 6 Wm. Mitchell L.Rev. 1, 7–20 (1980), *cited with approval in Superwood*, 311 N.W.2d at 161 n. 5. The primary burden of the law of products liability is imposed on sellers and manufacturers because they are in a better position to minimize or eliminate the risk of losses caused by defective products. *See East River Steamship*, 476 U.S. at 866–67, 106 S.Ct. at 2299–2300. While this rationale may be less compelling in cases based on strict liability, nowhere is it more appropriate than in cases involving personal injury or damage to property other than the product containing the defect caused by the seller's failure to exercise reasonable care, i.e., negligence. The instant case presents an appropriate situation in which to distinguish between negligence and strict tort liability theories of recovery rather than abandoning the "other property" prong of *Superwood* and its progeny.

The majority suggests that the UCC preempts the entire field of tort law. Majority Op. at 688. The majority, however, cites no decision in which a court has held that the UCC pre-empts the law of negligence in a case involving damage to other property. In *Spring Motors Distrib., Inc. v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660 (1985), the New Jersey Supreme Court carefully summarized and analyzed the area of the law where UCC rules and tort law intersect. *Id.* at 565–71, 489 A.2d at 665–68. In concluding that a commercial buyer may not resort to strict liability or negligence theories in order to recover "economic loss," [2] the court distinguished cases involving property damage and reasoned that the policies underlying tort law and the UCC favor restricting a commercial buyer to an action for breach of warranty. *Id.* at 577–78, 489 A.2d at 671–72. In so doing, the New Jersey Supreme Court basically adopted the reasoning of the majority of courts that have considered this issue and our *Superwood* decision. *Id.* at 581, 489

A.2d at 673 (citing, among others, *Superwood*).

It is worth noting that the *Spring Motors* court treated strict liability as conceptually distinct from negligence. In analyzing the negligence claim, the court concluded that the seller's duty of care "generally stops short of creating a right in a commercial buyer to recover a purely economic loss." *Id.* at 579, 489 A.2d at 672; *see also* Franklin, *When Worlds Collide: Liability Theories and Disclaimers in Defective-Products Cases*, 18 Stan.L.Rev. 974, 983–86 (1966) (concluding that the UCC is not intended to exclude negligence from its remedial scheme). In the present case, the integrity of the UCC could be preserved by a similarly careful analysis of the elements of a negligence claim and the applicable defenses in the context of a commercial transaction.

Rather than emasculate the remedies provided in the UCC, imposing liability for damage to "other property" caused by the seller's failure to exercise reasonable care would encourage sellers to take the steps suggested by the code in order to avoid or limit their exposure to liability. Sellers could take advantage of the freedom of contract provided under the UCC and expressly, specifically, and conspicuously limit remedies available. Alternatively, sellers could exercise reasonable care in order to minimize whatever liability was not effectively disclaimed or limited. This court should not, based on hypothetical bargaining behavior, supply the missing disclaimers or limitations of liability. At a minimum, the court should require some evidence that the parties actually negotiated the risk of loss resulting from the seller's negligence. *See Consumers Power Co. v. Curtiss-Wright Corp.*, 780 F.2d 1093, 1096–97 (3rd Cir.1986) (citing *Spring Motors*).

If this court must hypothesize as to the bargaining behavior of "sophisticated parties," it should at least be consistent about its "expectations." If these parties are as

---

**2.** The *Spring Motors* court defined "economic loss" as including the loss of the benefit of the bargain and indirect losses such as lost profits,

but not including a claim for physical harm to person or property. *Id.* 98 N.J. at 566, 489 A.2d at 665–66.

sophisticated as the majority suggests, this court should presume that the parties were aware of the *Superwood* rule and intended the liability imposed by it, like the law of implied warranty, to be a part of their contract unless effectively disclaimed or limited. Contrary to the majority's implied pre-emption analysis, Minn.Stat. § 336.1–103 (1988) provides that, "unless displaced by the particular provisions of this chapter," the principles of law and equity supplement the UCC. Rather than displacing the law of negligence, Minn.Stat. § 336.2–719(1)(b) (1988) provides that remedies specified in a limitation-of-remedies agreement are exclusive only if the parties expressly agree that they are exclusive. It is well settled that parties to a contract can limit their liability for their own negligence. *See, e.g., Independent School Dist. No. 877 v. Loberg Plumbing & Heating Co.,* 266 Minn. 426, 434, 123 N.W.2d 793, 798 (1963). There is nothing in the record which indicates that the parties intended that either party would be exonerated from liability for damage caused by any party's negligence. Accordingly, subject to the threshold requirements of *Superwood,* recovery under tort law should be available.

The majority's response to the "steady stream" of *Superwood* cases will cause a flood of litigation in this area. There are sure to be cases relating to the scope of the definitions of "commercial transaction" or "sophisticated parties." In light of the majority's expansive definition of dicta, it will not be long before this court is asked to abandon the personal-injury prong of the *Superwood* rule in cases involving "sophisticated parties." It is likely that, soon, it will be argued that the majority's discussion of the "panoply-of-liability theory" available to aggrieved consumers should also be disregarded.

By ignoring precedent since *Superwood,* the majority decision creates more uncertainty. In the absence of an express agreement between the parties, the right to recover damages in cases involving damage to the purchaser's other property should not turn on the status of the purchaser as a sophisticated commercial party but, instead, on whether the seller was negligent. In the present case, it would create far less uncertainty to modify *Superwood* so as to shield merchants from liability without fault, *i.e.,* strict liability, rather than exonerate all negligent merchants in response to a judicially perceived threat to the efficacy of the code. If the law of negligence must be displaced in order to preserve the integrity of the code, the Minnesota Legislature, in the manner suggested by Minn. Stat. § 336.1–103 (1988), is the proper branch of government to make whatever changes are necessary by amending the pertinent provisions of the code. At the very least, if this court feels compelled to make such unforeseeable changes in the law of products liability, it should make them prospectively in order to avoid prejudicing unfairly those who, in negotiating contracts, were entitled to rely on an unbroken line of decisions by this court. *See Hoff v. Kempton,* 317 N.W.2d 361, 363 (Minn.1982).

In summary, under *Superwood,* there is no tort liability for the damage to the potato crop grown with the defective seed. This is economic loss relating to the product itself and is, therefore, subject to the terms of the parties' contract. There is, however, potential liability [3] for the damage caused to the separate crop grown in the separate fields planted with the non-defective seed because, as conceded by the majority, this is unmistakably "other property." As a result, I believe that appellants were entitled to jury instructions on the negligence theories asserted and that the trial court abused its discretion by failing to give them; therefore, I would reverse and remand for a new trial.

---

**3.** It may very well be that a properly instructed jury would find that, in the present case, the seller was not negligent.