**80 SOUTH EIGHTH STREET LIMITED PARTNERSHIP; et al., Plaintiffs–Respondents,**

v.

**CAREY–CANADA, INC., et al., Defendants,**

**W.R. Grace Co., Defendant–Appellant.**

No. C1–91–1427.

Supreme Court of Minnesota.

June 26, 1992.

Rehearing Denied Sept. 11, 1992.

Hugh Plunkett, III, Thomas K. Berg, John C. Childs, Thomas J. Radio, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for appellant.

Lawrence A. Moloney, Timothy J. Dolan, Dawn L. Gagne, Doherty, Rumble & Butler, and R. Terri Mandel, O'Connor & Hannan, Minneapolis, for respondent.

Hubert H. Humphrey, III, Atty. Gen., Catherine F. Haukedahl, Asst. Atty. Gen., St. Paul, (for amicus curiae State of Minn.)

KEITH, Chief Justice.

The Federal District Court of Minnesota has certified to this court three questions of law:

1. Whether the economic loss doctrine as set forth in *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159 (Minn.1981), and *Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn.1990), bars the owner of a building with asbestos-containing fireproofing from suing the manufacturer of the fireproofing under the tort theories of negligence and strict liability for the costs of maintenance, removal and replacement of the fireproofing?

2. If the economic loss doctrine as set forth in *Hapka* would bar a building owner from suing the [asbestos-containing fireproofing] manufacturer in tort for negligence and strict liability claims, does Chapter 352 of the 1991 Minnesota Session Laws apply retroactively to a case initiated in 1988?

3. If Chapter 352 of the Minnesota Session Laws applies retroactively, does Minnesota law permit an owner of a building to sue the manufacturer of asbestos-containing fireproofing under the tort theories of negligence and strict liability for the costs of maintenance, removal and replacement of the fireproofing?

The context for the certified questions is the motion for summary judgment by asbestos manufacturer W.R. Grace ("Grace") on the issue of its liability in negligence and strict liability for the costs of maintenance, removal and replacement of its Monokote fireproofing in the IDS Center located in Minneapolis, Minnesota. For purposes of presenting the above-stated questions of law to this court, the federal district court deemed Grace, the appellant, and 80 South Eighth Street Limited Partnership ("80 South Eighth"), respondent.

The IDS Center, constructed in 1970–72, is 52 stories high and is comprised of four commercial buildings: a tower and annex which includes office, retail, and common space, a hotel, a Woolworth store and underground parking. The IDS Center is used on a daily basis by tenants who lease space in the building, by maintenance and administrative staff, and by the general public.

The original owners of the IDS Center sold the property to Oxford Development Minnesota, Inc. ("Oxford") in 1981. In February 1982, Oxford and the Bell System Trust ("Bell") formed a limited partnership, the 80 South Eighth Street Limited Partnership. Under the partnership agreement, the general partner, Oxford, transferred title to the IDS Center to the new partnership; Oxford and Bell each hold a fifty percent interest in 80 South Eighth.

Two types of asbestos-containing fireproofing, Firebar and Monokote, were used in the construction of the IDS Center. Firebar, manufactured by Carey Canadian Mines, Limited ("Carey"), and by the Celotex Corporation ("Celotex"), was used on the first few floors of the tower and the first few floors of the annex. Carey and Celotex declared bankruptcy in October, 1990, and are no longer parties to this suit. After problems arose with the Firebar fireproofing, the decision was made to install Monokote fireproofing, manufactured by Grace, in the balance of the tower and the annex, and in the Woolworth building.

In 1986 and 1987, the Illinois Institute of Technology was employed to conduct a full survey of all floors of the IDS Center. 80 South Eighth learned from this study that asbestos-containing fireproofing was on the beams and columns on all floors of the IDS Tower, all floors of the IDS annex, and both floors of the Woolworth building. 80 South Eighth also conducted tests which showed that Monokote, even when undisturbed, will release substantial numbers of asbestos fibers. In addition, 80 South Eighth has had to institute costly maintenance procedures to keep the ceiling tiles and light fixtures in the IDS Center free from asbestos fibers.

In 1988, 80 South Eighth brought suit against Grace for compensatory damages to cover the costs of maintenance, removal and replacement of the asbestos in the Center, for punitive damages, and for costs of that suit. 80 South Eighth claims that the original owners, architects, and general contractors had intended to avoid asbestos-containing fireproofing by selecting "cementitious" fireproofing and, were not aware that the Monokote installed in the IDS Center contained asbestos. 80 South Eighth does not seek damages for personal injuries and there are no allegations of personal injuries caused by the asbestos-containing fireproofing used in the building. There are also no allegations that the Monokote has failed to perform its fireproofing function. In defense, Grace denies that the mere presence of asbestos in the building constitutes a health risk. Grace also claims that the original owners and construction team specified Monokote fireproofing and were aware of the presence of asbestos in the fireproofing. Grace further asserts that 80 South Eighth knew that Monokote was asbestos-containing fireproofing when it acquired its interest in the IDS Center.

On August 1, 1991, the federal district court certified the above-stated questions and granted Grace's motion for summary judgment on express warranty, implied warranty of fitness for a particular purpose, misrepresentation and fraud, nuisance and restitution, and conspiracy and concert of action. The Federal court, however, denied Grace's motion for summary judgment on primary assumption of the risk; statute of limitations, Minn.Stat. § 541.051 (1988); constitutionality of the revival statute, Minn.Stat. § 541.22 (1988); and implied warranty of merchantability.

Because we answer the first certified question in the negative, we do not reach the other two questions. To answer the first question, we must examine the permissible overlap between tort and contract remedies available in Minnesota to commercial parties.

### I.

Tort actions and contract actions protect different interests. Through a tort action, the duty of certain conduct is imposed by law and not necessarily by the will or intention of the parties. The duty may be owed to all those within the range of harm, or to a particular class of people. On the other hand, contract actions protect the interests

in having promises performed. Contract obligations are imposed because of conduct of the parties manifesting consent, and are owed only to the specific parties named in the contract. *See* W. Prosser, Handbook of the Law of Torts § 92 (4th ed. 1971).

The economic loss doctrine provides a balance between two conflicting societal goals: that of encouraging marketplace efficiency through the voluntary contractual allocation of economic risks with that of discouraging conduct that leads to physical harm. *See* Connaughton, Comment, *Recovery for Risk Comes of Age: Asbestos in Schools and the Duty to Abate a Latent Environmental Hazard*, 83 Nw.U.L.Rev. 512, 525–56 (1989).

*Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159 (Minn.1981), is the leading economic loss case in Minnesota. There, Superwood Corporation purchased a hot plate press from Siempelkamp Corporation. After 21 years of operation without problems, the press failed and could not be repaired. Superwood then brought suit under negligence and strict liability theories, as well as under contract and warranty theories, seeking damages for the press and for lost profits—all economic losses. We held, "[E]conomic losses that arise out of commercial transactions, except those involving personal injury or damage to other property, are not recoverable under the tort theories of negligence or strict products liability." *Id.* at 162. The underlying rationale of *Superwood* was the statutory scheme of the Uniform Commercial Code and the ability of commercial parties to bargain for risks of loss. We said, "To allow tort liability in commercial transactions would totally emasculate [the warranty] provisions of the U.C.C." *Id.*

Likewise, in *Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn.1990), property damages resulting from ring rot infected seed potatoes purchased from a seed potato farm were deemed to be economic loss. We said, "[T]he Uniform Commercial Code must control exclusively with respect to damages in a commercial transaction which involves property damage only * * *." *Id.* at 688. We noted that in its design, the

Uniform Commercial Code "encourages negotiated agreements concerning all aspects of a commercial transaction including warranties, warranty disclaimers, and liability limitations." *Id.* We agree with Grace that if 80 South Eighth's alleged injuries constitute economic losses, then *Hapka* bars 80 South Eighth's tort claims.

Here, 80 South Eighth seeks recovery for costs of maintenance, removal and replacement of the asbestos-containing fireproofing. Such a claim appears to be economic loss as defined in *Minneapolis Society of Fine Arts v. Parker–Klein Associates Architects, Inc.*, 354 N.W.2d 816 (Minn.1984), where plaintiff, a purchaser of bricks, sued the manufacturer in negligence and strict liability for deterioration of the bricks themselves. We said that plaintiff was barred from proceeding in tort because the claim was one for economic loss "defined as resulting from the failure of the product to perform to the level expected by the buyer and commonly * * * measured by the cost of repairing or replacing the product and the consequent loss of profits, or by the diminution in value of the product because it does not work for the general purposes for which it was manufactured and sold * * *. The damages sought in this case by [Minneapolis Society of Fine Arts] for removal and replacement of the brick and other consequential loss fall squarely within this 'economic loss' definition. As such, they were recoverable in contract, if at all." *Id.* at 820–21 (citations omitted).

We find that the rationale set forth in *Hapka* supports a definition of economic loss premised on a product's failure to perform as promised. The underlying assumption in *Hapka*, as in all our cases of economic loss, is that commercial parties bring their experiences in the marketplace to the negotiations; that their reasonable contemplation is embodied in the transaction; that at the time of the contract formation they have defined the product, identified the risks, and negotiated a price of the goods that reflects the relative benefits and risks to each party. *Hapka v. Paquin Farms*, 458 N.W.2d 683, 688 (Minn.1990).

In *S.J. Groves and Sons Co. v. Aerospatiale Helicopter Corp.*, 374 N.W.2d 431 (Minn.1985), plaintiff corporation, S.J. Groves and Sons Co., sought recovery for damage to a helicopter purchased from defendant Aerospatiale Helicopter Corp., loss of use, lost profits, and other incidental and consequential damages resulting from a crash of the helicopter. We held that plaintiff was seeking recovery for economic losses arising from the helicopter's failure to live up to plaintiff's expectations as to suitability, quality, and performance, and that such product failure was the type of problem that warranty law and the Uniform Commercial Code were designed to remedy. *Id.* at 434.

Here, however, there is a distinguishing factor. The claim here is not that the fireproofing failed to perform satisfactorily as fireproofing. Such a claim arising from the failure of the product to meet expectations of suitability, quality and performance resulting in damages which a party to a sales contract could reasonably expect would flow from a defect in the product is a benefit of the bargain claim better addressed under contract and the Uniform Commercial Code. Rather, the claim here is that the Monokote introduced into the building asbestos which is highly dangerous to humans.[1] *See Independent School District No. 197 v. W.R. Grace & Co.*, 752 F.Supp. 286, 300 (D.Minn.1990).

We are not persuaded by Grace's argument that cases from other jurisdictions which have allowed suits in tort for removal and replacement of asbestos-containing fireproofing were solely premised on the "other property" exception to the economic loss doctrine, which was not available in Minnesota. *See Hapka*, 458 N.W.2d at 683. We simply do not believe that 80 South Eighth's claim of asbestos contamination is one for economic loss. 80 South Eighth is not seeking enforcement of the benefit of their bargain regarding the fireproofing performance of the Monokote. In seeking the costs of maintenance, removal and replacement, 80 South Eighth seeks the costs of eliminating the risks of injury and of making the building safe for all those who use and occupy this property.

Nor are we persuaded by Grace's characterization of cases of asbestos removal in governmental buildings and school districts as cases of personal injury to which the economic loss doctrine does not apply. Those cases did not turn on allegations of personal injury. *See, e.g., City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (4th Cir.1987); *Independent School District No. 197 v. W.R. Grace & Co.*, 752 F.Supp. 286 (D.Minn.1990). Furthermore, the Uniform Commercial Code applies to a sale of goods even where the buyer is a public entity.

Instead, we find persuasive the state and federal decisions which have held that where the claim is for the contamination of the entire building with allegedly dangerous asbestos fibers, the claim is not one for economic loss. *See, e.g., City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975, 978 (4th Cir.1987) (the risk posed by materials containing friable asbestos "is not the type of risk that is normally allocated between the parties to a contract by agreement"); *T.H.S Northstar Assoc. v. W.R. Grace & Co.*, 767 F.Supp. 969, 974 (D.Minn. 1991) ("Parties to a commercial transaction can experience non-economic losses when damage to property results from a condition other than a product's failure to meet bargained-for expectations."); *Independent School District No. 197 v. W.R. Grace & Co.*, 752 F.Supp. 286, 302 (D.Minn. 1990) (claim arises not from a failure of the asbestos to perform its function as a fire retardant, but from contamination of the entire building with allegedly dangerous asbestos fibers); *Northridge Co. v. W.R. Grace & Co.*, 162 Wis.2d 918, 471 N.W.2d 179, 186 (1991) ("The essence of the plaintiffs' claim is that Monokote releases toxic substances in the environment thereby

---

1. Amicus, Attorney General of the State of Minnesota, joins 80 South Eighth's argument that the asbestos poses an unreasonable risk of harm to the public because even in its undisturbed form, it continues to release asbestos fibers throughout the building, thereby endangering not only the health of the occupants of the building, but that of the general public.

causing damage to the building and a health hazard to its occupants.").

## II.

We believe that allowing 80 South Eighth to proceed in tort for damages relating to the maintenance, removal and replacement of asbestos-containing fireproofing advances both the rationale and public policy objectives of tort law and the Uniform Commercial Code. In the seminal economic loss case, Justice Traynor stated:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands.

*Seeley v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, 151 (1965). Grace's fireproofing continues to provide fireproofing, but it does so by allegedly creating unreasonable risks of harm.

Asbestos fibers, if inhaled, can disrupt the normal functioning of the lungs and cause serious health problems. Asbestosis (a fibrous scarring of the lungs), lung cancer, and mesothelioma (a cancer of the lining of the chest or abdominal cavity) have been linked to asbestos exposure. There may be a long interval between the time of exposure to asbestos and the time when symptoms of asbestos related disease appear. *See* Environmental Protection Agency, *Managing Asbestos in Place: A Building Owner's Guide to Operations and Maintenance Programs for Asbestos–Containing Materials*, July 1990 at 2. It is generally accepted that mesothelioma is not dose related but can be caused by a single exposure to asbestos. *See Independent School District No. 197 v. W.R. Grace & Co.*, 752 F.Supp. 286, 294 (D.Minn. 1990). One objective of tort law is to deter unreasonable risks of harm. A building owner acts reasonably in attempting to avoid or to minimize the risks of injury to the occupants of the building. Rather than waiting for an occupant or user of the building to develop an asbestos related injury, we believe building owners should be encouraged to abate the hazard to protect the public. We believe our decision today will do so.

## III.

Furthermore, our decision does not preempt the legislature, but instead, is in keeping with legislative intent to revive claims for removal of asbestos in buildings. The revival statute [2] is a manifestation of

---

**2.** In 1987, the legislature enacted Minnesota Statute § 541.22, Limitation on Asbestos Claims, the purpose of which is as follows:

> The legislature finds that it is in the interest of the general public, particularly those persons who may bring claims regarding materials containing asbestos and those against whom the claims may be brought, to set a specific date by which *building owners must bring a cause of action for removal or other abatement costs associated with the presence of asbestos in their building.*

Minn.Stat. § 541.22, subd. 1 (Supp.1987) (emphasis added).

The statute specifically addressed an action to recover for the removal of asbestos from buildings, and the words, "against a manufacturer or supplier of asbestos or material containing as-

bestos" were originally inserted between "an action" and "to recover" in subdivision 2. That limiting language was removed in the 1988 amendment and subdivision 2 then read:

> Notwithstanding any other law to the contrary, an action to recover for (1) removal of asbestos or materials containing asbestos from a building, (2) other measures taken to locate, correct, or ameliorate any problem related to asbestos in a building, or (3) reimbursement for removal, correction, or amelioration of an asbestos problem that would otherwise be barred before July 1, 1990, as a result of expiration of the applicable period of limitation, is revived or extended. An asbestos action revived or extended under this subdivision may be begun before July 1, 1990.

Minn.Stat. § 541.22, subd. 2 (1988).

the legislature's express intent that asbestos removal claims be treated differently from claims of economic loss which fall under the Uniform Commercial Code. We note the unusual and unique circumstance that without the revival statute, this case could not have been brought.

We therefore hold that the economic loss doctrine does not bar the owner of a building with asbestos-containing fireproofing from suing the manufacturer of the fireproofing under the tort theories of negligence and strict liability for the costs of maintenance, removal and replacement of the fireproofing. Because we so hold, we do not have occasion to answer the other two certified questions of law.