Rick GLORVIGEN, as Trustee for the next-of-kin of decedent James Kosak, Respondent (A10–1242, A10–1246),

Thomas M. Gartland, as trustee for the next of kin of decedent Gary R. Prokop, Respondent (A10–1243, A10–1247),

v.

CIRRUS DESIGN CORPORATION, Respondent (A10–1242, A10–1243), Appellant (A10–1246, A10–1247),

Estate of Gary Prokop, by and through Katherine Prokop as Personal Representative, Respondent (A10–1242, A10–1246),

University of North Dakota Aerospace Foundation, Appellant (A10–1242, A10–1243) Respondent (A10–1246, A10–1247).

Nos. A10–1242, A10–1243, A10–1246, A10–1247.

Court of Appeals of Minnesota.

April 19, 2011.

Philip Sieff, Vincent J. Moccio, Heather M. McElroy, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, for respondent-Rick Glorvigen, as Trustee for the next-of-kin of decedent James Kosak.

Eric J. Magnuson, Amie E. Penny, Briggs and Morgan, P.A., Minneapolis, MN; and Edward J. Matonich, Darrold E. Persson, David Arndt, Matonich & Persson, Chartered, Hibbing, MN, for respondent-Thomas M. Gartland, as Trustee for the next of kin of decedent Gary R. Prokop.

Robert W. Vaccaro, Timothy R. Schupp, Gaskins, Bennett, Birrell, Schupp, L.L.P., Minneapolis, Minnesota for respondent-Estate of Gary Prokop, by and through Katherine Prokop as Personal Representative

Bruce Jones, Daniel J. Connolly, Dan Herber, Faegre & Benson LLP, Minneapolis, MN; and Patrick E. Bradley, Tara E. Nicola, Reed Smith LLP, Princeton, NJ, for appellant-Cirrus Design Corporation.

Charles E. Lundberg, Steven P. Aggergaard, Bassford Remele, P.A., Minneapolis, MN; and William J. Katt, Leib & Katt, LLC, Milwaukee, WI, for appellant-University of North Dakota Aerospace Foundation.

William M. Hart, Damon L. Highly, Meagher & Geer, P.L.L.P., Minneapolis, MN, for Amicus Curiae–Minnesota Defense Lawyers Association.

Robert J. Hajek, Hajek & Beauclaire, LLC, Minnetonka, MN; and Ronald D. Golden, Raymond C. Speciale, Yodice Associates, Frederick, MD, for Amicus Curiae–Aircraft Owners and Pilots Association.

Andrea B. Niesen, Bird, Jacobsen & Stevens, P.C., Rochester, MN, for Amicus Curiae–Minnesota Association for Justice.

Considered and decided by
KLAPHAKE, Presiding Judge;
JOHNSON, Chief Judge; and LARKIN, Judge.

## OPINION

LARKIN, Judge.

This appeal rises from the district court's entry of judgment against appellants, following a jury trial, on negligence claims stemming from an airplane crash and the resulting death of the plane's pilot and passenger. Appellants challenge the district court's denial of their motions for judgment as a matter of law (JMOL) and for a new trial. Appellants primarily argue that they are entitled to JMOL because they did not owe decedents a duty of care. We conclude that appellants are not liable, as a matter of law, under respondents' product-liability theory. We further conclude that respondents' claims are non-cognizable because they sound in educational malpractice. We therefore reverse and remand for entry of judgment in appellants' favor, without addressing appellants' other assignments of error.

## FACTS

Gary Prokop and James Kosak were killed during an airplane crash near Hill City, Minnesota, in January 2003. Prokop was piloting the aircraft, a recently purchased Cirrus SR22. Kosak was Prokop's sole passenger. Prokop received his pilot's license in 2001 and had logged approximately 225 hours of flight time, mostly in his Cessna 172. Prokop had a visual-flight-rules (VFR)[1] certification. Under this certification, Prokop was prohibited from flying into clouds or other inclement conditions that might require reliance on instrument flying. Although Prokop had not yet obtained his instrument rating, which would have permitted him to fly in instrument meteorological conditions

---

1. Visual flight rules, or "VFR," refers to weather conditions when visibility is three miles or greater and the cloud ceiling is 1,000 feet or greater.

(IMC)[2], Prokop was in the process of training for instrument certification. Prokop had logged more than 60 hours of instrument-flight instruction and had fulfilled all of the requirements necessary to take his instrument-flight examination.

Prokop purchased his Cirrus SR22 airplane in 2002 from appellant Cirrus Design Corporation. Cirrus provided Prokop with a Pilot's Operating Handbook and FAA [(Federal Aviation Administration)] Approved Airplane Flight Manual for the Cirrus Design SR22. The cover states:

THIS HANDBOOK INCLUDES THE MATERIAL REQUIRED TO BE FURNISHED TO THE PILOT BY FAR PART 23 AND ADDITIONAL INFORMATION PROVIDED BY CIRRUS DESIGN AND CONSTITUTES THE FAA APPROVED AIRPLANE FLIGHT MANUAL

The handbook is divided into ten sections: (1) general information regarding the airplane and a description of symbols, abbreviations, and terminology used throughout the handbook; (2) limitations, including those related to airspeed, power plant, instrument markings, altitude, maneuvers, and systems; (3) emergency procedures, including ground emergencies, in-flight emergencies, landing emergencies, and system malfunctions; (4) normal procedures, including airspeed, preflight procedures, takeoff, climb, cruise, descent, landing, post-landing, and environmental considerations; (5) performance data, including associated conditions affecting performance, flight planning, and a sample problem; (6) weight and balance information, including airplane weighing procedures and loading instructions; (7) airplane and systems description, including primary flight controls, engine, fuel, elec-

trical, and autopilot; (8) handling, service, and maintenance; (9) supplements; and (10) safety information focusing on the Cirrus parachute system.

The autopilot system, which is central to this litigation, is described in section seven of the handbook. The handbook indicates that the autopilot features, among other things, "Heading Hold and Command," "Altitude Hold and Command," and "Vertical Speed Hold and Command." The handbook refers the pilot to an applicable supplement for full operational procedures and a description of implemented autopilot modes. The autopilot supplement is contained in section nine of the handbook and is divided into seven sections: (1) general information regarding the autopilot system; (2) limitations on use of the autopilot; (3) emergency procedures if the autopilot malfunctions; (4) normal autopilot operating procedures; (5) performance; (6) weight and balance; and (7) systems descriptions. The "Normal Procedures" section of the autopilot supplement provides detailed instructions regarding in-flight procedures, including how to operate the heading, altitude-hold, and vertical-speed modes.

Although FAA regulations did not require Cirrus to offer training, Cirrus included two days of "transition training" in the purchase price of the SR22. Transition training is a specialized type of training that is provided when a licensed pilot learns to fly a new type of plane. It is intended to teach the pilot the intricacies of the new plane that he or she will be flying. For example, Prokop's previous aircraft was a Cessna with a top speed of 127 knots. The SR22 had a top speed of 180 knots. And unlike the Cessna 172, the

---

**2.** Instrument meteorological conditions, or "IMC," are any conditions that do not satisfy VFR standards.

SR22 was equipped with an autopilot system. An expert trial witness described transition training as follows: "[t]he training is there because the airplanes are different ... You take the knowledge ... that the pilot has, and you pretty much tailor a program not specifically to him, but specifically to the airplane that he's coming from and going to so that you can maximize his learning experience essentially."

Cirrus's transition training is described in a document entitled "Pilot Training Agreement," which states that

Transition training for one (1) SR22 pilot will be furnished to the initial Purchaser, subject to the following:

. . . .

B. Pilot Training will consist of Cirrus's standard two-day transition training program as follows:

1. Aircraft systems training with emphasis on the innovative aspects of the SR22. Examples include combined throttle/propeller control, side yoke and autopilot/trim system.

2. Flight training to proficiency, in accordance with trainer's standards. Normally this aspect of training will result in 4–5 hours of flight time.

3. Avionics systems training with particular emphasis on the use of GPS and the multi-function display.

The Cirrus transition training assumes a current, active general aviation pilot already rated in single-engine airplanes. Extra training will be available at additional cost for non-current pilots and for those who wish to contract for additional training services.

The inclusion of transition training in the price of the SR22 was part of Cirrus's marketing for the plane. The transition training provided Prokop with the opportunity to earn a high-performance-aircraft endorsement, which is necessary for a pilot to fly an SR22. But the Pilot Training Agreement states that

[n]either Cirrus, nor its training contractor, will be responsible for competency of Purchaser (or Purchaser's pilot) during or after training. Cirrus does not warrant that this training will qualify Purchaser (or Purchaser's pilot) for any license, certificate or rating.

Prokop availed himself of the transition training included in the purchase price of the SR22 and separately contracted for an additional one and one-half days of flight training. Cirrus, in turn, contracted with appellant University of North Dakota Aerospace Foundation (UNDAF) to provide the transition training. The training materials included an "Initial Training Syllabus" that detailed the "Cirrus Factory Training Course." The syllabus describes five sessions of ground training and five flight lessons. The fifth flight lesson is the "Final Evaluation Flight." Each flight lesson enumerates several maneuvers that are included within the lesson. There are four short, blank lines before each enumerated maneuver; the lines correspond with columns labeled as "U" (unsatisfactory), "M" (marginal), "S" (satisfactory), and "E" (excellent), which reflect the applicable grading system for the training course. These lines provide a location for the instructor to rate the pilot's performance on each maneuver. The following language is included above the maneuvers in each flight lesson: "Skipped items should be left unchecked." The syllabus also states that

A maneuver in which a U or M grade is posted may be discontinued and remain incomplete at the Instructor's discretion. However, *ALL* maneuvers on the Final Evaluation Flight must be completed with a grade of S or E for a Completion Certificate to be awarded. Additionally,

all ground school lessons and required worksheets must be accurately completed for a Completion Certificate to be awarded.

Prokop took delivery of his SR22 on December 9, 2002, and participated in Cirrus's transitional training program from December 9 to 12. Prokop's training consisted of five flights, totaling 12.5 hours of flight training, and 5.3 hours of ground instruction. Prokop's syllabus indicates that he completed the Final Evaluation Flight with a satisfactory grade and was awarded a certificate of completion and a high-performance endorsement, which was "Valid in Cirrus SR–22 only." Prokop signed the evaluation, indicating that he had "reviewed and accept[ed] the above evaluation."

On the morning of January 18, 2003, Prokop and Kosak intended to fly in the SR–22 from Grand Rapids to St. Cloud to attend their sons' hockey tournament. Prokop called FAA weather briefers twice that morning. At 4:56 a.m., Prokop was informed of some low clouds. Prokop called again at 5:41 and was informed of "marginal" conditions around Grand Rapids and that the sky was partially obscured with clouds. He told the briefer that he "was hoping to slide underneath it and then climb out." Based on the available weather reports, Prokop was "legal to fly," that is, he was cleared to fly based on his VFR license and the available weather reports.

Prokop and Kosak departed from the Grand Rapids airport at approximately 6:30 a.m. Minutes later, the aircraft struck the ground, killing both men. Expert trial testimony suggested that Prokop encountered "IMC-like" conditions and that the aircraft entered an "accelerated stall" and crashed when Prokop tried to exit the conditions.

The trustee for Kosak's next of kin sued Cirrus and respondent Estate of Gary Prokop. The complaint claims that Cirrus undertook a duty to provide Prokop with flight training, that Cirrus breached an implied warranty of merchantability by omitting a flight lesson regarding recovery from VFR into IMC conditions, and that Prokop was negligent in piloting the aircraft. The trustee for Prokop's next of kin also sued Cirrus, claiming that Cirrus was negligent in the "designing, testing, manufacturing, sale, distribution, maintenance, warnings, pilot training, and instructions given regarding the aircraft."

Cirrus removed the cases to federal court, but the cases were remanded to state court for lack of a federal issue. *Glorvigen v. Cirrus Design Corp. and Gartland v. Cirrus Design Corp.*, Nos. 05–2137 and 05–2138, 2006 WL 399419, at *6 (D.Minn. Feb. 16, 2006). Cirrus then brought a third-party action against employees of the FAA. The FAA removed the case to federal court, and Cirrus moved for summary judgment. The federal district court granted partial summary judgment to Cirrus on Prokop's next of kin's warranty and strict-product-liability claims against Cirrus. *Glorvigen v. Cirrus Design Corp.*, No. 06–2661, 2008 WL 398814, at *7 (D.Minn. Feb. 11, 2008). The FAA also moved for summary judgment, and the federal district court granted the motion, determining that FAA specialists had breached no duty as a matter of law. *See Glorvigen v. Cirrus Design Corp.*, No. 06–2661 (D.Minn. June 24, 2008) (order op.). The federal district court again remanded the case to state court. *Id.* Later, the state district court granted UNDAF's motion to intervene as a defendant.

The case was tried to a jury. The trial focused on whether Cirrus and UNDAF provided adequate training regarding autopilot-assisted recovery when a pilot en-

counters IMC conditions. The UNDAF instructor who trained Prokop, Yu Weng Shipek, testified that the SR22 autopilot is like a motor vehicle's cruise control: its "heading bug" helps the pilot fly a certain direction. Shipek also testified that the autopilot "altitude hold button" would hold the aircraft's cruising altitude. John Wahlberg, UNDAF's site manager at the Cirrus Factory Training Center, testified that the autopilot is a device that assists pilots with basic maneuvers, including a VFR pilot's procedure for escaping IMC conditions. Wahlberg testified that a VFR pilot escapes IMC conditions by making a 180–degree turn and that "the autopilot just makes that easier."

The evidence showed that Cirrus provided Prokop with both written instructions and ancillary transition training regarding how to use the autopilot. The written instructions included the Pilot's Operating Handbook and the autopilot supplement, described above. The transition training included an SR22 training manual, two hours of ground instruction entitled "VFR into IMC Procedures SR20/22," and a PowerPoint presentation, all of which explained how to use the autopilot. Autopilot instruction was also included in the "pre-training packet" Prokop was expected to have reviewed prior to attending the training. Finally, Prokop received a grade of satisfactory on flight lesson maneuvers entitled "Intro to Autopilot operation" and "Autopilot operations."

But respondents presented evidence that appellants failed to provide Prokop with a flight lesson described in the syllabus as "Flight 4a." This lesson includes a maneuver entitled "Recovery from VFR into IMC ( [autopilot] assisted)." None of the rating lines next to this maneuver, or any of the other maneuvers included in Flight 4a, were marked on Prokop's syllabus, indicating that the flight lesson was not provided. Flight-instructor Shipek testified that he provided Prokop with the flight lesson, even though the syllabus advisory clearly states, above the maneuvers, that "[s]kipped items should be left unchecked."

With regard to the crash, respondents presented evidence that Prokop departed Grand Rapids in marginal weather conditions and may have become spatially disoriented. Expert witness James Walters testified that, based on his analysis of weather data and witness statements, he concluded that Prokop inadvertently entered "IMC-like" conditions near Hill City and decided to return to Grand Rapids. Based on his wreckage analysis, altitude data, and National Transportation Safety Board reports, Walters concluded that the aircraft entered "an accelerated stall" and crashed. Walters explained that Prokop tried to manually turn the plane sharply, unexpectedly descended, tried to pull up at high speed, stalled and crashed. Walters identified three "root causes" of the crash: (1) Prokop "made a poor decision to go flying that day"; (2) Prokop lacked "tools" to appropriately assess aeronautical risks; and (3) Prokop lacked "the proper tools to be able to recover" from inadvertently encountering IMC-like conditions. Walters testified that "Had Mr. Prokop been adequately trained in the use of the autopilot, I believe that he would have been able to recover from this situation by using the autopilot and the crash would not have occurred." Walters explained

> Well, an autopilot will do a lot of good things for the pilot of an aircraft depending on the capabilities of that particular autopilot and this one is a very good one. In its most basic form, it will keep the wings level. It will also maintain a heading across the ground and it will maintain altitude if it's all programmed properly to do that.

But Walters agreed that a VFR-rated pilot, like Prokop, is trained "to fly wings level and to start a turn, 180–degree turn to get out of the situation" when inadvertently entering IMC conditions—with or without an autopilot. Walters also agreed that Prokop would have been required to demonstrate proficiency on this procedure, without using an autopilot, to receive his current pilot's license. Prokop's regular flight instructor, Steven Day, testified he believed that Prokop was proficient with the procedure a VFR-rated pilot uses to escape IMC conditions. But Day also testified that Prokop's prior training in his Cessna would not be sufficient for the SR22.

At the close of the plaintiffs' case in chief, Cirrus and UNDAF each moved for JMOL on several grounds. They argued that they did not owe Prokop and Kosak a legal duty because the negligence claims were barred under the educational-malpractice doctrine and that there was insufficient nonspeculative evidence that lack of training caused the crash. The district court denied the motions.

The jury returned a special verdict finding Cirrus, UNDAF, and Prokop negligent and allocating fault as follows: Cirrus 37.5%, UNDAF 37.5%, and Estate of Gary Prokop 25%. The jury awarded damages of $7,400,000 to Kosak's next of kin and $12,000,000 to Prokop's next of kin.

Cirrus renewed its motion for JMOL posttrial, arguing that the negligence claims against Cirrus were barred under the educational-malpractice doctrine and that there was insufficient evidence that Cirrus's acts or omissions proximately caused the deaths of Prokop and Kosak. Cirrus also moved for a new trial, arguing that the verdict was not justified by the evidence and that the district court failed to provide an appropriate curative instruction in response to "improper and inflam-matory comments by [plaintiff's counsel] in closing argument." UNDAF also renewed its motion for JMOL. Additionally, UNDAF moved for JMOL on the ground that the estates of Prokop and Kosak cannot take judgment against UNDAF because they never directly sued UNDAF. Finally, UNDAF moved for a new trial claiming that it was prejudiced by errors of law as to the jury instructions and improper statements of counsel during closing argument.

The district court denied appellants' motions for JMOL and motions for a new trial, rejecting the argument that the negligence claims were barred as a matter of law under the educational-malpractice doctrine. The district court entered judgment against Cirrus and UNDAF, and this consolidated appeal follows.

## ISSUES

I.  Does an airplane manufacturer's duty to warn by providing adequate instructions for the safe use of its aircraft include a duty to provide pilot training?

II. Are negligence claims against an aviation-training provider barred under the educational-malpractice doctrine where the essence of the claims is that the provider failed to provide an effective education?

## ANALYSIS

Appellants raise several arguments in support of reversal. Cirrus argues that the negligence claims sound in educational malpractice and are therefore barred as a matter of law; "the [district] court improperly created a new cause of action for negligent performance of contract that merges contract and tort duties and redefines negligence to exclude reasonable care"; the evidence of causation is legally

549

insufficient; and "the egregious and improper comments of [counsel for the trustee for Prokop's next of kin] in closing argument unfairly prejudiced Cirrus." UNDAF argues that the negligence claims sound in educational malpractice and are therefore barred as a matter of law; the district court's creation of a legal duty for "negligent performance" of a contract is not supported by Minnesota law; the evidence does not establish, beyond speculation, that lack of training caused the crash; and UNDAF cannot be held directly liable to either the next of kin of Prokop or Kosak because neither sued UNDAF. We begin with appellants' principal arguments that they did not owe Prokop and Kosak a duty as a matter of law, which relate to the district court's denial of their motions for JMOL.

## I.

■ "We apply de novo review to the district court's denial of a Rule 50 motion [for JMOL]." *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn.2009). JMOL should be granted

> only in those unequivocal cases where (1) in the light of the evidence as a whole, it would clearly be the duty of the [district] court to set aside a contrary verdict as being manifestly against the entire evidence, or where (2) it would be contrary to the law applicable to the case.

*Jerry's Enters., Inc., v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816 (Minn.2006) (quotation omitted).

■ "The basic elements of a negligence claim are: (1) existence of a duty of care; (2) breach of that duty; (3) proximate causation; and (4) injury." *Bjerke v. Johnson*, 742 N.W.2d 660, 664 (Minn.2007). A district court errs by submitting a negligence claim to a jury when no duty exists. *See ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 308 (Minn.1996) (concluding that "the [district] court erred in submitting plaintiff's negligence claim to the jury because Service-Master failed to establish that Sentry owed it a duty"); *Balder v. Haley*, 399 N.W.2d 77, 81 (Minn.1987) (stating that the district court erred by allowing the existence of a duty to go to the jury). "[T]he existence of a duty ... is a legal question to be determined by the judge, not the jury." *Balder*, 399 N.W.2d at 81. On appeal, the existence of a duty is a question of law subject to de novo review. *Bjerke*, 742 N.W.2d at 664.

Respondents contend that appellants owed Prokop and Kosak a duty under common law, based on a product-liability theory, to wit: the duty to warn of dangers inherent in the use of a product by providing adequate instructions. Appellants counter that respondents are inappropriately attempting to "retroactively characterize their claims as product liability negligence claims." Appellants argue that respondents did not plead or try a product-liability case, the district court did not treat the claims as product-liability claims, and the federal district court's award of summary judgment on Prokop's next of kin's strict-liability failure-to-instruct claim forecloses as a matter of law "any" negligent failure-to-instruct claim.[3]

---

3. The federal district court's award of summary judgment in Cirrus's favor on the strict-liability failure-to-instruct claim was limited to Prokop's next of kin and Cirrus. *Glorvigen*, 2008 WL 398814 at *5 (explaining that Prokop's next of kin asserted a claim of strict product liability against Cirrus but were not successful, on the merits, in its attempt to assert that the aircraft was defective because of inadequate instructions). At that point in the litigation, Kosak's next of kin had not asserted a product-liability claim, and UNDAF had not intervened.

Because respondents' product-liability theory fails on the merits, we do not address appellants' procedural challenges.

▮▮▮ "In general, a supplier has a duty to warn end users of a dangerous product if it is reasonably foreseeable that an injury could occur in its use." *Gray v. Badger Mining Corp.*, 676 N.W.2d 268, 274 (Minn.2004). The duty to warn includes providing adequate instructions for the safe use of the product. *Id.* "[W]here the manufacturer or the seller of a product has actual or constructive knowledge of danger to users, the seller or manufacturer has a duty to give warning of such dangers." *Frey v. Montgomery Ward & Co.*, 258 N.W.2d 782, 788 (Minn.1977). "To be legally adequate, the warning should (1) attract the attention of those that the product could harm; (2) explain the mechanism and mode of injury; and (3) provide instructions on ways to safely use the product to avoid injury." *Gray*, 676 N.W.2d at 274. The adequacy of a warning must be evaluated in light of the knowledge and expertise of those who may be reasonably expected to use the product. *Dahlbeck v. DICO Co.*, 355 N.W.2d 157, 163 (Minn.App. 1984), *review denied* (Minn. Feb. 6, 1985).

The Minnesota Supreme Court has endorsed the broad statement of principles contained in the Restatement (Second) of Torts § 388 (1965) with respect to suppliers of goods. *Gray*, 676 N.W.2d at 274. According to section 388:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388.

Respondents argue that "[t]he manufacturer of a product, like Cirrus, has a duty imposed by law to provide instructions adequate for safe use of its product." Respondents maintain that Cirrus,

> as the seller of a potentially dangerous piece of equipment, had an obligation imposed by law to provide adequate instructions in the safe use of the product. Cirrus addressed that obligation by undertaking to provide a specific course of training and instruction for the safe use of the SR22 [ (i.e., the transition training) ]. The detailed curriculum was written by Cirrus and UNDAF to provide the requisite instructions.... Cirrus failed to provide the training it promised, and which it had determined was appropriate and adequate under the circumstances. While the law imposed a duty on Cirrus to provide adequate instructions, and required that Cirrus and its agent, UNDAF, exercise reasonable care in the discharge of that duty, appellants' own curriculum established the standard of conduct by which their actions could be judged.

▮▮▮ Appellants do not appear to dispute that Cirrus, as the supplier of a high-performance aircraft, had a duty to warn Prokop of dangers associated with the air-

craft.[4] Instead, their arguments focus on the scope of Cirrus's duty to warn and attendant duty to provide adequate instructions for safe use. *See Frey*, 258 N.W.2d at 787 ("The duty to warn has been described as two duties: (1) The duty to give adequate instructions for safe use; and (2) the duty to warn of dangers inherent in improper usage."). Respondents assert that Cirrus offered transition training as a means of satisfying its duty to warn by providing adequate instructions for safe use. But the record indicates that the purpose of transition training was to assist Prokop to become *proficient* in the use of an unfamiliar aircraft. Although proficiency training undoubtedly promoted the safe use of the SR22, we find no support in the law for respondents' proposition that Cirrus's duty to warn included an obligation to train Prokop to proficiently pilot the SR22—which is the crux of respondents' claims.

Moreover, the purpose of requiring warnings and attendant instructions for safe use is to put the user on notice of the dangers associated with the product. *See Gray*, 676 N.W.2d at 274 (explaining that "[t]o be legally adequate, the warning should (1) attract the attention of those that the product could harm; (2) explain the mechanism and mode of injury; and (3) provide instructions on ways to safely use the product to avoid injury"); Restatement (Third) of Torts: Products Liability § 2 cmt. i (1998) ("Instructions inform persons how to use and consume products safely. Warnings alert users and consumers to the existence and nature of product risks so that they can prevent harm either by appropriate conduct during use or consumption or by choosing not to use or consume."). This purpose is reflected in Minnesota caselaw. For example, the cases cited by respondents involve a manufacturer's failure to provide a warning regarding dangers associated with the misuse of products. *See, e.g., Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 923–24 (Minn.1986) (failure to warn that safe operation of a hydraulic press required proper installation of a functional safety bar); *Frey*, 258 N.W.2d at 786 (failure to warn that a space heater should not be used in house trailers or in other poorly insulated and tightly enclosed spaces); *Lovejoy v. Minneapolis–Moline Power Implement Co.*, 248 Minn. 319, 326–27, 79 N.W.2d 688, 694 (1956) (failure to warn of danger from operating a tractor in excess of the recommended speed).

Although respondents cite aviation cases from other jurisdictions to show that the "long-recognized duty to provide adequate instruction for the safe use of a product has been applied in plane crash[es]," none of the cases involves an alleged failure to train a pilot to proficiency. Instead, the cases involved the traditional failure to warn: failure to provide the user with written information that (1) puts the user on notice of the dangers associated with the product and (2) instructs regarding how to use the product in a manner that avoids the dangers. *See, e.g., Driver v. Burlington Aviation, Inc.*, 110 N.C.App. 519, 430 S.E.2d 476, 480 (1993) (alleging that Cessna published an instructional

---

**4.** It is not apparent that Cirrus had a duty to warn Prokop. Several potential defenses can obviate or discharge a supplier's duty to warn. *Gray*, 676 N.W.2d at 275. "Under the sophisticated user defense, a supplier has no duty to warn the ultimate user if it has reason to believe that the user will realize its dangerous condition." *Id.* at 276. "Generally, there is no duty to warn if the user knows or should know of potential danger." *Minneapolis Soc'y of Fine Arts v. Parker–Klein Assocs. Architects, Inc.*, 354 N.W.2d 816, 821(Minn.1984), *overruled on other grounds by Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn.1990).

manual that "'promulgated dangerously inadequate information about preventing carburetor icing and wrongfully instructed concerning carburetor icing and the slow-flight characteristics of the aircraft'"); *Berkebile v. Brantly Helicopter Corp.*, 225 Pa.Super. 349, 311 A.2d 140, 142, 144 (1973) (alleging that helicopter manufacturer "gave no adequate warnings" in the flight manual or on the cockpit placard "of the need for instantaneous reaction in emergency power failure"), *aff'd*, 462 Pa. 83, 337 A.2d 893 (1975). These cases are factually distinguishable from this case in that respondents challenge the adequacy of ancillary training services instead of written instruction manuals.

Respondents argue that the "only distinction" is "the **medium** of the instruction—a written instruction manual rather than instruction given orally during flight instruction" and that the means chosen to fulfill a duty to provide adequate instructions for the safe use of a dangerous product does not change the nature of the duty. But this argument ignores the fact that Cirrus provided written instructions regarding the safe use of the SR22, which were separate and distinct from the transition training: the Pilot's Operating Handbook and FAA Approved Airplane Flight Manual for the Cirrus Design SR22. This handbook provides detailed instructions regarding how to activate and operate the autopilot. Respondents do not claim that this information was inadequate to put Prokop on notice of the dangers associated with piloting the SR22.

In summary, respondents' contention that the duty to warn by providing adequate instructions for safe use includes an obligation to train the end user to proficiency is unprecedented. And in the absence of precedent, we are not willing to extend the duty to warn to encompass this obligation. Although Prokop may have needed transition training to safely pilot the SR22, it does not follow that Cirrus had a duty to provide the training. We therefore hold that to the extent that Cirrus had a duty to warn, the duty did not include the provision of transition training. Accordingly, any liability based on appellants' failure to provide adequate transition training cannot be sustained under a product-liability theory.

## II.

We next consider appellants' argument that the negligence claims against Cirrus and UNDAF are noncognizable because they sound in educational malpractice. The educational-malpractice bar was first recognized in Minnesota in *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 472 (Minn.App.1999) ("The question of whether courts should recognize a claim for educational malpractice is one of first impression in Minnesota."). In *Alsides*, this court found persuasive "the analysis of those courts that have rejected, on public policy grounds, claims for educational malpractice." *Id.* at 473. We defined educational-malpractice claims as those that "would require the court to engage in a comprehensive review of a myriad of educational and pedagogical factors, as well as administrative policies." *Id.* (quotation omitted). And we concluded that the district court had properly dismissed claims by students that challenged the general quality of the education they had received. *Id.* Although we adopted the analysis of those courts that had rejected claims for educational malpractice, we also adopted the majority rule that "a student may bring an action against an educational institution for breach of contract, fraud, or misrepresentation, if it is alleged that the institution failed to perform on specific promises it made to the student and the claim would not involve an inquiry into the

nuances of educational processes and theories." *Id.* (quotation omitted).

██ There are generally three broad categories of educational-malpractice claims: "(1) the student alleges that the school negligently failed to provide him with adequate skills; (2) the student alleges that the school negligently diagnosed or failed to diagnose his learning or mental disabilities; or (3) the student alleges that the school negligently supervised his training." *Dallas Airmotive, Inc. v. FlightSafety Int'l, Inc.*, 277 S.W.3d 696, 699 (Mo.Ct. App.2008). The court in *Dallas Airmotive* provided the following examples:

> If a negligence claim raises questions concerning the reasonableness of the educator's conduct in providing educational services, then the claim is one of educational malpractice. Similarly, if the claim requires an analysis of the quality of education received and in making that analysis the fact-finder must consider principles of duty, standards of care, and the reasonableness of the defendant's conduct, then the claim is one of educational malpractice. If the duty alleged to have been breached is the duty to educate effectively, the claim is one of educational malpractice. A claim that educational services provided were inadequate, substandard, or ineffective constitutes a claim of educational malpractice. Where the court is asked to evaluate the course of instruction or the soundness of the method of teaching that has been adopted by an educational institution, the claim is one of educational malpractice.

*Id.* at 700 (quotation and citations omitted). The bar on educational-malpractice claims recognizes that "[a]llowing individuals ... to assert claims of negligent instruction would avoid the practical reality that, in the end, it is the student who is responsible for his knowledge, including the limits of that knowledge." *Page v. Klein Tools, Inc.*, 461 Mich. 703, 610 N.W.2d 900, 906 (2000).

The gravamen of respondents' claims is that appellants breached their duty to provide adequate flight training by omitting Flight 4a, which included instruction regarding how to use the autopilot to escape IMC conditions. Essentially, respondents' theory is that appellants did not teach Prokop what he needed to know to use the autopilot to escape the "IMC-like" conditions that he encountered before the crash. Despite respondents' reliance on one allegedly promised[5] but undelivered flight lesson, respondents ultimately challenge the quality of the transition training. This challenge requires review of the instructor's failure to provide flight training, in addition to ground training, regarding use of the autopilot to escape unexpected IMC conditions. But a determination of whether the transition training was ineffective because the instructor failed to provide a flight lesson on this topic would involve an inquiry into the nuances of the educational process, which is exactly the type of determination that the educational-malpractice bar is meant to avoid. *See Alsides*, 592 N.W.2d at 473–74.

Respondents contend that *Alsides* is inapplicable because *Alsides* did not involve a negligence claim. Although the *Alsides* plaintiffs "styled" their claims as breach of contract, fraud, and misrepresentation, this court determined that claims challeng-

---

5. The syllabus, by its own terms, did not require satisfactory completion of the "Recovery from VFR into IMC ([autopilot] assisted)" flight maneuver. The only mandatory flight maneuvers were those included in the final- evaluation flight. The "Recovery from VFR into IMC ([autopilot] assisted)" flight maneuver is not included in the final-evaluation flight.

ing the general quality of the education received properly were dismissed because the essence of these claims was that the school failed to provide an "effective education." *Id.* at 473. We explained,

> [w]here the essence of the complaint is that the school failed to provide an effective education, it is irrelevant whether the claim is labeled as a *tort* action or breach of contract, since in either situation the court would be forced to enter into an inappropriate review of educational policy and procedures.

*Id.* (emphasis added) (quotation omitted). Thus, respondents cannot avoid the *Alsides* holding simply because their claims are "styled" in negligence. The relevant inquiry is whether "the essence of the complaint is that the school failed to provide an effective education." *Id.* (quotation omitted). And this is the essence of respondents' claims.

Respondents further argue that *Alsides* is inapplicable because Cirrus is an airplane manufacturer and not in the business of education. Respondents cite no authority holding that the educational-malpractice bar applies only to entities or individuals that are primarily or solely in the business of education, and there is no Minnesota caselaw on point. We find a decision of the Supreme Court of Connecticut instructive in this regard. In *Gupta v. New Britain Gen. Hosp.*, the principal issue was "the proper characterization of a residency agreement pursuant to which a surgical resident was dismissed during the final year of his residency training program." 239 Conn. 574, 687 A.2d 111, 112 (1996). The surgical resident argued that the residency agreement gave rise to an employment, rather than educational, rela-

tionship and that his dismissal should not have been characterized as an academic decision, "to which courts should normally defer." *Id.* at 115. The Supreme Court of Connecticut disagreed, reasoning that the hospital "assumed educational responsibilities related to, but distinct from, its function as an institution for healing the sick" by conducting a residency program. *Id.* at 118. The court therefore applied the educational-malpractice bar in determining that summary judgment was properly granted on the resident's claim that the hospital failed to provide a program that " 'would reasonably and adequately train him' ". *Id.* at 118–20.

The Supreme Court of Connecticut's reasoning is persuasive. Although Cirrus is not primarily in the business of education, it assumed educational responsibilities related to, but distinct from, its function as a manufacturer by offering transition training and thereby entered into an educational relationship with Prokop,[6] to which the educational-malpractice bar applies.

Moreover, a variety of public-policy grounds have been cited for barring educational-malpractice claims, including:

> (1) the lack of a satisfactory standard of care by which to evaluate an educator; (2) the inherent uncertainties about causation and the nature of damages in light of such intervening factors as a student's attitude, motivation, temperament, past experience, and home environment; (3) the potential for a flood of litigation against schools; and (4) the possibility that such claims will embroil the courts into overseeing the day-to-day operations of schools.

---

6. We note that respondents' reliance on *Larson v. Indep. Sch. Dist. No. 314*, 289 N.W.2d 112 (Minn.1979), *abrogated on other grounds by Anderson v. Anoka Hennepin Indep. Sch.* *Dist. No. 11*, 678 N.W.2d 651 (Minn.2004), discussed later in this section, is based on the educational relationship between appellants and Prokop.

*Alsides,* 592 N.W.2d at 472 (quotation omitted). The first two concerns potentially are implicated any time there is a challenge to the effectiveness of education or instruction provided by an institution—even if the institution is not primarily in the business of education.

■ In summary, the essence of the claims against appellants is that they failed to provide Prokop with effective training and that, as a result, Prokop was incapable of using the autopilot to safely escape the IMC-like conditions. Because the claims challenge the effectiveness of the training, they sound in educational malpractice and are barred as a matter of law. *See id.* at 473. And although the claims focus on appellants' failure to provide a particular flight lesson described in the syllabus, the only permissible redress for this failure is a fraud, misrepresentation, or breach-of-contract claim by the student: Prokop. *See id.* at 476 ("A *student* may bring an action against an educational institution for breach of contract, fraud, or misrepresentation if it is alleged that the educational institution failed to perform on specific promises it made to the student . . . ." (emphasis added)); *see also Cherne Contracting Corp. v. Wausau Ins. Cos.,* 572 N.W.2d 339, 343 (Minn.App.1997) (stating that "[u]nder Minnesota law, a party is not entitled to recover tort damages for a breach of contract, absent an exceptional case where the breach of contract constitutes or is accompanied by an independent tort" (quotation omitted)), *review denied* (Minn. Feb. 19, 1998); *Hanks v. Hubbard Broad., Inc.,* 493 N.W.2d 302, 307 (Minn. App.1992) (agreeing that "a contract claim should not be converted into a tort claim"), *review denied* (Minn. Feb. 12, 1993); *Ross v. Creighton Univ.,* 957 F.2d 410, 417 (7th Cir.1992) (explaining that a claim that an educational institution completely failed to perform an educational service, as opposed to a claim that it performed the service inadequately, sounds in contract).

Our conclusion that the claims are barred under the educational-malpractice doctrine forecloses relief under the other liability theories asserted by respondents. Although respondents primarily argue that Cirrus breached its common-law duty to warn, respondents also argue that appellants breached the duty not to cause physical injury by negligent conduct, relying on *Larson v. Indep. Sch. Dist. No. 314,* 289 N.W.2d 112 (Minn.1979), *abrogated on other grounds by Anderson v. Anoka Hennepin Indep. Sch. Dist. No. 11,* 678 N.W.2d 651 (Minn.2004). In *Larson,* an eighth-grade student was injured during a physical education class at his school while attempting a gymnastic exercise known as a "headspring over a rolled mat." 289 N.W.2d at 115. The exercise was a required activity in the student's physical education class. *Id.* Plaintiff alleged that his teacher was negligent in teaching the headspring before the class had participated in the necessary preliminary progressions of less advanced gymnastic exercises, "designed in part for safety," and that the teacher improperly spotted the exercise at the time the student was injured. *Id.* at 116. Although the teacher did not "specifically contest the sufficiency of the evidence as it relates to his negligence" on appeal, the supreme court affirmed the liability of the teacher, stating that there was sufficient evidence in the record that the teacher was negligent "in teaching the headspring at the time" (i.e., prior to teaching the necessary preliminary progressions) and that the accident occurred because the teacher was "negligent in spotting the headspring." *Id.*

The student also alleged that the school principal was negligent. *Id.* The supreme court stated that the principal had "a duty to exercise reasonable care in supervising

the development, planning, and administration of the physical education curriculum within the school; in supervising and evaluating the work of teachers within the school; and in maintaining conditions conducive to the safety and welfare of students during the school day." *Id.* The court concluded that the evidence supported the jury's finding that the principal was negligent. *Id.* at 118.

Respondents argue:

> As in *Larson*, here the claimed negligence was based on the failure of Cirrus, through its agent and joint venturer UNDAF, to provide the training called for in the curriculum they designed. Additionally, neither Cirrus nor UNDAF supervisors took any steps to review the training that Prokop actually received, and did nothing to verify that the training called for in the curriculum was completed. Just as in *Larson*, these facts fully support the imposition of liability.

We disagree. First, the existence of a duty of care was not challenged in *Larson*. Instead, the teacher and principal argued that any liability on their part was precluded by the common-law doctrine of discretionary immunity. *Id.* at 119. Second, although *Larson* recognizes that teachers and principals owe a duty of care to their students, the duty must be considered in context: an injury that occurred during educational instruction. Unlike Prokop and Kosak, the *Larson* student was injured during a physical education class, and his teacher's negligence was based on the teacher's failure to exercise reasonable care while instructing the student. *Id.* at 116. The supreme court's description of the principal's duty is similarly qualified: the principal had a duty to supervise and evaluate the work of the teachers "within the school" and to maintain conditions conducive to the safety of the students "dur-

ing the school day." *Id. Larson* simply does not hold that a teacher or principal has a duty to ensure that a student is not injured outside of the instructional process or after the course of instruction is complete.

If we were to extend the duty recognized in *Larson* to this case, where the injury occurred after the instructional process was complete, the resulting liability would not be based on the instructor's failure to exercise reasonable care to ensure the safety of a student during the instructional process. Instead, liability would be based on the instructor's failure to effectively educate or train the student such that the student's safety was ensured outside of the instructional process. But a claim under these circumstances would be based on the failure to provide an effective education, and it is therefore barred under the educational-malpractice doctrine. *See Alsides*, 592 N.W.2d at 473.

Respondents' assertion that appellants "assumed a duty" to provide adequate transition training also fails. Although one may assume a duty of care, *see Isler v. Burman*, 305 Minn. 288, 295, 232 N.W.2d 818, 822 (1975) ("It is well established that one who voluntarily assumes a duty must exercise reasonable care or he will be responsible for damages resulting from his failure to do so."), the duty must be one that is legally recognized. And Minnesota does not recognize the duty to effectively educate. *See Alsides*, 592 N.W.2d at 473.

We conclude our analysis by briefly addressing the district court's ruling. The district court concluded that respondents' claims are not barred under the educational-malpractice doctrine, reasoning that "this case does not implicate the same public policy rationales that would preclude finding the existence of a duty of care" because the negligence claims here

are "not in regards to **training that was provided** or training that **should have been included in the curriculum.** Rather, the claim here is that training that *was to be provided* as part of *UNDAF's curriculum, was not provided.*" The court explained that it was "simply extending," to cases sounding in negligence, the holding in *Alsides* that "[a] student may bring an action against an educational institution for breach of contract, fraud, or misrepresentation, if it is alleged that the educational institution failed to perform on specific promises it made to the student and the claim would not involve an inquiry into the nuances of educational processes and theories." *See Alsides,* 592 N.W.2d. at 476.

▇▇▇ This extension was improper. "[T]he task of extending existing law falls to the supreme court or the legislature, but it does not fall to this court." *Tereault v. Palmer,* 413 N.W.2d 283, 286 (Minn. App.1987), *review denied* (Minn. Dec. 18, 1987). And it is not the function of the district court to establish new causes of action, even when such actions appear to have merit. *See Stubbs v. N. Mem'l Med. Ctr.,* 448 N.W.2d 78, 81 (Minn.App.1989) (stating that it is not the function of the court of appeals to establish new causes of action), *review denied* (Minn. Jan. 12, 1990).

We recognize that this case involves the tragic deaths of two men, as well as emotional, physical, and financial losses for their families. And the district court understandably was troubled by application of the educational-malpractice bar in this case. The court explained:

> Finally, if the Court were to have determined that no duty existed it would create a very troubling precedent. In this case Gary Prokop undertook training from UNDAF to enable him to transition to flying the Cirrus SR–22. At the end of his education he was given a certificate which enabled him to fly his Cirrus plane. As has been noted at some length *Supra,* it is alleged that he did not receive certain transitional training. *The educational malpractice doctrine essentially vests educational institutions as the final arbiters of what is and what is not appropriate for a specific line of study.* Were the Court to find that no duty existed, not only would educational institutions be the final arbiters of what is appropriate but they would also be insulated from negligence claims by failing to provide what they themselves deem appropriate. *The only recourse for the aggrieved would be for claims brought under theories of contract as was already deemed permissible by the court in Alsides. Not finding a duty in this case would be tantamount to finding a total immunity for educational institutions that fail to provide training they deem appropriate against negligence claims.* This Court will not analyze how this might be stretched to absurdity, but the implications of such immunity are very troubling.

(Emphasis added.)

The italicized portions of the above-quoted language indicate that the district court correctly understood this court's holding in *Alsides* and the practical impact of the educational-malpractice bar. But the district court's concerns, however legitimate, reflect policy considerations and do not provide a basis to withhold application of the educational-malpractice bar.[7] *See*

---

7. In addition to concluding that respondents' negligence claims do not sound in educational malpractice and that the educational-malpractice bar is therefore inapplicable, the district court also concluded that the claims were properly framed as claims for negligent performance of a contract. The district court thoroughly explained its reasoning in this re-

*State v. M.L.A.*, 785 N.W.2d 763, 767 (Minn.App.2010) ("The district court, like this court, is bound by supreme court precedent and the published opinions of the court of appeals ...."), *review denied* (Minn. Sept. 21, 2010).

Because we conclude that respondents' claims sound in educational malpractice and are therefore barred as a matter of law, we do not address appellants' arguments regarding the sufficiency of proof as to causation, the allegedly improper statements of counsel for the trustee for Prokop's next of kin in closing argument, or whether judgment was properly entered against UNDAF.

## DECISION

Because an airplane manufacturer's duty to warn of dangers associated with the use of its aircraft does not include a duty to provide pilot training, respondents' negligence claims cannot be sustained under a product-liability theory. Moreover, because the claims sound in educational malpractice, they are barred as a matter of law.

We therefore reverse the district court's denial of appellants' motions for JMOL and remand for entry of judgment in appellants' favor.

**Reversed and remanded.**

KLAPHAKE, Judge (dissenting).

I respectfully dissent. I would affirm the district court's order, which denied JMOL and entered judgment against appellants Cirrus Design Corporation and University of North Dakota Aerospace Foundation (UNDAF).

Gary Prokop and James Kosak died in the crash of the high-performance Cirrus SR22 plane that Prokop purchased from Cirrus. Cirrus would not release this plane to Prokop until he participated in transition training that was part of the purchase contract and which was provided by UNDAF. Cirrus's transition training covered specific topics that highlighted the differences between a purchaser's previous experience and the unique features of the SR22. Cirrus provided the training materials to UNDAF. Each topic in the training materials included a checklist that was to be filled out when the training was completed; the instructor was warned not to leave the checklist blank. On Prokop's training record, the checklist for the maneuver "Recovery from VFR into IMC (auto-pilot assisted)" was left blank. Testimony at trial suggested that the failure to perform this very maneuver led to the fatal plane crash.

I start from the procedural posture of this matter. A jury heard and considered the testimony during a lengthy and involved trial and concluded that appellants bore 75% of the liability for the deaths of Prokop and Kosak in the plane crash. We do not lightly set aside a jury's verdict. In order to grant JMOL, there must be *no* factual support for the jury's verdict because it is "manifestly against the entire evidence" or contrary to law. *Longbehn v. Schoenrock*, 727 N.W.2d 153, 159 (Minn. App.2007). We examine the evidence in the light most favorable to the nonmoving party and will not set aside the jury's

---

gard, distinguishing between a claim for negligent performance of a contract and negligent breach of a contract. *See Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn.1983) ("We did not intend ... to recognize a new cause of action in negligence, i.e., negligent breach of a contractual duty."). But because we deter-mine the existence of a duty de novo, and we have determined that the claims here sound in educational malpractice and are therefore barred, we do not review the district court's analysis or decision regarding whether the claims were properly framed.

verdict "if it can be sustained on any reasonable theory of evidence." *Id.* (quotation omitted).

Appellants based their requests for JMOL on two grounds: (1) they had no duty to provide Prokop with transitional training and therefore had no legal duty to respondents; and (2) respondents' negligence claims were barred under the educational-malpractice doctrine. The majority accepts appellants' arguments. I disagree with the majority's conclusions on both legal theories.

Appellants argue that they owed no duty of care to Prokop. The existence of a duty of care is a question of law. *Bjerke v. Johnson*, 742 N.W.2d 660, 664 (Minn.2007); *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn.1995). Whether a duty exists is determined by examination of the event that caused the damage in light of the allegedly negligent act. *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn. 1986). If the connection is too remote, there is no duty; however, if the consequence is direct and reasonably foreseeable, a duty exists. *Id.* In Minnesota, one may assume a duty that does not otherwise exist, and "one who voluntarily assumes a duty must exercise reasonable care or he will be responsible for damages resulting from his failure to do so." *Isler v. Burman*, 305 Minn. 288, 232 N.W.2d 818, 822 (1975). In addition, the supplier of a dangerous product has a duty to warn and to give adequate instruction for the safe use of their dangerous product. *Gray v. Badger Min. Corp.*, 676 N.W.2d 268, 274 (Minn.2004).

Cirrus supplied purchasers of the SR22 with an operating handbook, an autopilot manual, an SR22 training manual, and a PowerPoint presentation. But in addition, Cirrus, through its agreement with UNDAF, provided, as a part of the purchase contract, transition training tailored to the needs and skills of the individual purchaser or pilot of each plane sold. In particular, the transition training emphasized the "innovative aspects of the SR22." Without the transition training, Cirrus would not release the SR22 to Prokop, who did not have the high performance aircraft endorsement required to pilot the airplane. The transition training was formatted to train a pilot new to the SR22 in particular areas, including the use of "Recovery from VFR into IMC (auto-pilot assisted)." There was factual support in the evidence presented to the jury that Prokop was not IFR-certified, was not auto-pilot certified, that the greater speed and power of the SR22 mandated the use of auto-pilot-assisted recovery from VFR into IMC in certain weather conditions, that training was required to perform this maneuver, and that Prokop's failure to use the maneuver caused the high-speed stall that ultimately led to the crash of the plane.[8] Clearly, Cirrus did not feel that its training manuals alone provided adequate warning and that the transition training was part of its duty to warn. While transition training may not be required as a matter of law, once Cirrus made it a part of the purchase agreement, Cirrus voluntarily assumed a duty to provide the promised training.

On these facts, the crash here is a direct and foreseeable consequence of appellants' failure to provide the salient portion of the transition training to Prokop. *See Germann*, 395 N.W.2d at 924. Accordingly, it was not contrary to law for the district court to submit the question of negligence

---

**8.** While there was some evidence to the contrary, at this stage in the proceedings, we examine only whether there was reasonable factual support for the jury's verdict; we do not re-weigh the evidence.

to the jury nor was the jury's verdict manifestly against the entire evidence.

Second, I disagree with the majority's conclusion that the educational-malpractice doctrine applies under the facts of this case because (1) neither Cirrus nor UN-DAF is an educational institution, and (2) even if appellants were educational institutions, the educational-malpractice doctrine was not intended to apply when a negligence claim for failure to provide promised educational instruction does not depend on an inquiry into the efficacy of the educational instruction.

The leading case setting forth the educational-malpractice doctrine as it applies in Minnesota is *Alsides v. Brown Inst., Ltd.,* 592 N.W.2d 468 (Minn.App.1999). As is true in a majority of jurisdictions, the *Alsides* court ruled that claims of educational malpractice, which would require a court to inquire into "educational and pedagogical factors, as well as administrative polices," are barred. 592 N.W.2d at 473. The *Alsides* court based its decision on a number of policy reasons: (1) the lack of a standard for evaluation of a program; (2) inherent uncertainty about causation that could not be determined without intervening factors related to the student's willingness or ability to learn; (3) a potential flood of litigation; and (4) a desire not to "embroil the courts into overseeing the day-to-day operations of schools." *Id.* at 472 (quotation omitted).

But although we agreed in *Alsides* that claims challenging the general quality of instructors or effectiveness of education received are barred, we also recognized that the doctrine does not apply to claims involving "specific aspects" of a promise to educate that "would not involve an inquiry into the nuances of educational processes

and theories." *Id.* at 474. Included within this exception is a claim that specific instruction was promised, yet not provided. *Id.* at n. 3 (stating that certain claims were erroneously dismissed based on educational-malpractice bar, including, as an example, the promise of instruction on installation and upgrade of Unix operating systems that was not fulfilled).

Here, the evidence showed that appellants failed to complete Prokop's transition training as promised. Although appellants contend that this was not the case, the record offers reasonable factual support for the jury's conclusion that appellants failed to provide all of the promised training.[9] Respondents have not alleged that the training received for "Recovery from VFR into IMC (auto-pilot assisted)" was ineffective or that the instruction was of poor quality; rather, the record evidence is that this promised aspect of training was not provided. This is precisely the type of claim that the *Alsides* court concluded was permissible and not barred by the doctrine of educational malpractice.

Further, appellants have not addressed the issue of whether the educational-malpractice bar is intended to benefit entities that are not educational institutions. *See id.* at 472 ("Courts in other jurisdictions have recognized that the basic relationship between a student and *an educational institution* is contractual in nature.") (quotation omitted and emphasis added). Cirrus is an airplane manufacturer; although UNDAF is associated with an educational institution, the University of North Dakota, it operates as an entity separate from the university for the purpose of providing on-site factory training for Cirrus. Appellants cannot credibly argue that UNDAF is an educational institution. Under appellants' expansive definition of "educational

---

**9.** Again, our review here is whether the jury's verdict is manifestly against the *entire* evidence, not whether there is evidence to sup-

port a contrary view. *Longbehn,* 727 N.W.2d at 159 (emphasis added).

institution," every coffee pot manufacturer who issues instructions for its product's use would constitute an educational institution to which the educational-malpractice bar would apply.

Finally, appellants argue that the district court impermissibly created a new cause of action, negligent performance of a contract, and that respondents would be limited to damages under the contract, presumably the price of transition training. Although, generally, a party's damages for a breach of contract are limited to the economic losses arising out of the contract itself, such as lost profits or the purchase price, there is an exception when personal injury or damage to other property is involved. *80 S. 8th St. Ltd. P'ship v. Carey–Canada, Inc.*, 486 N.W.2d 393, 396 (Minn. 1992). As in *80 S. 8th St.*, this is not a suit on the contract for economic loss, but one for personal injury. And as in *80 S. 8th St.*, such claims are recoverable.

And while "the standard of care owed to others by a contracting party is not fixed by the contract," a jury may use the contract terms when determining whether a party has acted reasonably. *Canada by Landy v. McCarthy*, 567 N.W.2d 496, 504 (Minn.1997). Here, the terms of the contract provide a reference for the jury's determination of whether appellants acted reasonably in undertaking its duty to Prokop.

Ultimately, the majority's view of this case depends on weighing the facts found by the jury in a light unfavorable to its verdict, sidestepping settled principles of negligence law while expanding the educational-malpractice doctrine. I would affirm the jury's verdict, as did the district court in denying appellants' motions for judgment as a matter of law.